Cyndie M. Chang (SBN 227542)
cmchang@duanemorris.com
Angela Hebberd (SBN 300114)
ahebberd@duanemorris.com
**DUANE MORRIS LLP**
865 S. Figueroa Street, Suite 3100
Los Angeles, CA 90017
Telephone: +1 213.689.7400
Facsimile: +1 213.689.7401

Lawrence H. Pockers (*pro hac vice* motion
forthcoming)
lhpockers@duanemorris.com
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103
Telephone: +1 215.979.1000
Facsimile: +1 215.979.1020

Attorneys for Plaintiffs, ARAMARK
MANAGEMENT, LLC and HPSI
PURCHASING SERVICES LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARAMARK MANAGEMENT, LLC and HPSI PURCHASING SERVICES LLC, | Case No. 8:18-cv-1888 |
| | **COMPLAINT FOR:** |
| Plaintiffs, | 1. **Breach Of Contract** |
| | 2. **Breach Of Duty Of Loyalty** |
| v. | 3. **Tortious Interference With Contract** |
| STEVE BORGQUIST, BRENT BORGQUIST, and BANNER PURCHASING LLC, | 4. **Tortious Interference With Prospective Economic Advantage** |
| | 5. **Negligent Interference With Prospective Economic Advantage;** |
| Defendants. | 6. **Violation Of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs, Aramark Management, LLC ("Aramark") and HPSI Purchasing

Services LLC ("HPSI") (collectively, "Plaintiffs"), bring this Complaint against

Defendants, Steve Borgquist, Brent Borgquist and Banner Purchasing LLC

("Banner") (collectively, "Defendants") for breach of contract, breach of the duty of loyalty, tortious interference with contract, tortious interference with prospective economic advantage, negligent interference with economic advantage and violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, and in support thereof aver as follows:

## PARTIES

1.      Plaintiff Aramark is, and at all relevant times herein mentioned was, a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Philadelphia, Pennsylvania.

2.      Plaintiff HPSI is, and at all relevant times herein mentioned was, a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Philadelphia, Pennsylvania.

3.      Upon information and belief, Defendant Steve Borgquist is a citizen of the State of California, last known to reside in San Clemente, California.  Steve Borgquist was formerly the Managing Director, Operations for HPSI and an employee of Aramark.

4.      Upon information and belief, Defendant Brent Borgquist is a citizen of the State of California, last known to reside in Laguna Niguel, California.  Brent Borgquist was formerly an Account Manager for HPSI and an employee of Aramark.

5.      Defendant Banner is a limited liability company organized and existing under the laws of the state of Nevada with its principal place of business in Mission Viejo, California.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because it involves a dispute between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      As set forth below, complete diversity of citizenship exists between

2
COMPLAINT

Plaintiffs and Defendants.

8.     With respect to Plaintiffs, Aramark is a citizen of **Delaware** and **Pennsylvania** since the state of incorporation and principal place of business of each of its members is in Delaware or Pennsylvania.

9.     More specifically, the sole member of Aramark (and, in turn, its state of incorporation and principal place of business) is as follows:

a.  Aramark Services, Inc., a corporation organized under the laws of Delaware with its principal place of business in Philadelphia, Pennsylvania.

10.     HPSI is a citizen of **Delaware** and **Pennsylvania** since the state of incorporation and principal place of business of each of its members is in Delaware or Pennsylvania.

11.     More specifically, the sole member of HPSI (and, in turn, its state of incorporation and principal place of business) is as follows:

a.  Aramark Services, Inc., a corporation organized under the laws of Delaware with its principal place of business in Philadelphia, Pennsylvania.

12.     With respect to Defendants, Steve Borgquist and Brent Borgquist are each citizens of **California**.

13.     Banner is a corporate citizen of **California**.

14.     More specifically, Banner was registered in Nevada on July 9, 2018, listing Steve Borgquist as its sole (and Managing) Member.  *See* Exhibit "D." Therefore, Banner is a corporate citizen of California, based on the citizenship of its sole Member.

15.     Venue and jurisdiction are appropriate in the judicial district because each of the individual Defendants resides in this district, Banner regularly conducts business in this district and this district is the location where a substantial part of the events giving rise to the claim occurred.

# FACTUAL ALLEGATIONS

## Plaintiffs' Business

16.    Aramark is a leading global provider of food, facilities and uniform services to healthcare, business and industry, education, and sports, leisure and corrections clients.  Aramark acquired HPSI in 2016.

17.    HPSI is a leading Group Purchasing Organization ("GPO") providing services to healthcare providers, educational institutions and hospitality businesses throughout the United States.

18.    A GPO is an entity that is created to leverage the purchasing power of a group of businesses to obtain discounts from vendors based on the collective buying power of the GPO members.

19.    HPSI began in 1964 when Blaine G. Lindahl presented a plan to four Southern California hospitals to reduce their paper and medical supply costs by combining their purchasing volumes.  The strategy was an immediate success saving the hospitals thousands of dollars each year.

20.    Over the years, HPSI extended the strategy to other product areas and other user groups.  HPSI's membership grew to include thousands of healthcare providers, educational institutions and hospitality businesses throughout the United States.  By combining the purchasing power of this vast membership base, HPSI created an expansive network of local and national contracts providing substantial volume discounts and low prices on a wide range of quality name brand products, services and equipment.

21.    Along the way, HPSI spearheaded significant innovations to its group purchasing strategy including the development of sophisticated computer technology and the implementation of a comprehensive portfolio of discounted manufacturer agreements.

## The Borgquists

22.    Steve Borgquist was originally hired by HPSI in July 2012.  Prior to

4

COMPLAINT

working for HPSI, he had not worked for any other GPO and had no industry experience.

23.     Steve Borgquist was placed in a position of trust and confidence and quickly rose through the ranks at HPSI and later Aramark.  By the time an entity affiliated with Aramark acquired HPSI in 2016, Steve Borgquist was the Executive Vice President of National Accounts at HPSI, reporting only to the Managing Director of HPSI, David Lindahl, the son of HPSI's founder, Blaine Lindahl.

24.     In 2017, Steve Borgquist became Managing Director, Operations of HPSI when David Lindahl recommended that he be promoted into that role.

25.     Brent Borgquist – Steve Borgquist's brother – was hired by HPSI in March 2011.  Prior to working for HPSI, he had not worked for any other GPO and had no industry experience.

26.     Brent Borgquist was also placed in a position of trust and confidence by HPSI and later Aramark.  At the time of his resignation, Brent Borgquist was an Account Manager for HPSI, overseeing HPSI's relationship with some of its key customers.

27.     During and through their employment with HPSI and later Aramark, Steve Borgquist and Brent Borgquist (sometimes referred to collectively herein as the "Borgquists") individually and/or collectively learned the ins and outs of the GPO business; gained access to Plaintiffs' most sensitive business and financial information; were the beneficiaries of the deep customer relationships and customer goodwill Plaintiffs built up with their customers over many years; received valuable and specialized training; were highly compensated; and otherwise received valuable consideration that they would not have received but for their employment with HPSI and Aramark.

28.     The business, financial, customer and other information which the Borgquists benefitted from as a result of their employment with Plaintiffs has been compiled by Plaintiffs over many years, and at significant cost and effort.  Plaintiffs

consider this information (among other information of Plaintiffs) to be trade secret, confidential and/or proprietary.

### Steve Borgquist's Agreement With Aramark

29. On July 11, 2016, in connection with the acquisition of HPSI by an Aramark affiliate, Steve Borgquist executed a Proprietary Information and Post-Employment Restrictions Agreement with Aramark (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A."

30. The Agreement fully comports with California law, among other reasons because the post-termination of employment restrictions on customer solicitation and competition (sections 3.2, 3.3 and 3.4) are expressly excluded and made inapplicable to Steve Borgquist as an employee "based in California." *See* Exhibit "A" at § 3.5.

31. As part of the Agreement, Steve Borgquist agreed, among other things, that his employment by the Company, defined to include Aramark and its affiliated entities, which would include HPSI, "creates a relationship of confidence and trust with respect to the Company's Proprietary Information [as defined in § 1.2 of the Agreement] and that the Company has a protectable interest therein." *See* Exhibit "A" at § 1.1.

32. He further agreed that he would not disclose or use any of the Company's Proprietary Information on behalf of himself or a competitor. *See* Exhibit "A" at § 1.3.

33. Steve Borgquist also agreed that during the course of his employment he would not, without the express written consent of the Company, "engage in any employment or business activity that is competitive in any way with the business, or planned business, of the Company or (ii) would conflict with, or otherwise interfere with [his] ability to satisfactorily perform the duties and responsibilities of [his] employment by the Company." *See* Exhibit "A" at § 2. *See also* §§ 3.3 and 3.4 (as modified by § 3.5 so that the restrictions in those subsections only applied during Steve Borgquist's employment).

DM1\9062318.4

34.     Steve Borgquist also agreed that during the period of his employment and for a period of one year after the date his employment with Aramark ended for any reason, he would not "solicit, induce, encourage, or participate, directly or indirectly, in soliciting, inducing, or encouraging any employee . . . to terminate or reduce his or her relationship with Aramark." *See* Exhibit "A" at § 3.1.

35.     He further agreed that during the period of his employment, he would not "solicit, divert or appropriate or attempt to solicit, divert or appropriate, by use of proprietary information or otherwise, any customer of Aramark with whom [he had] contact and/or about which [he] had Proprietary Information during [his] employment with Aramark, for the purpose of selling or providing to that customer any services or products competitive with those available from Aramark." *See* Exhibit "A" at § 3.2 (as modified by § 3.5 so that the restriction in this subsection only applied during Borgquist's employment).

36.     Steve Borgquist acknowledged that the Agreement "does not prevent me from earning a living or pursuing my career" and further agreed that the restrictions in the Agreement were "reasonable, proper, and necessitated by the Company's legitimate business interests."   *See* Exhibit "A" at § 4.  He further agreed that he entered into the Agreement "freely and with knowledge of its contents with the intent to be bound." *Id*.

37.     Steve Borgquist also agreed that if Plaintiffs are successful in whole or in part in any legal or equitable action under the Agreement, Plaintiffs "shall be entitled to payment of all costs, including reasonable attorney's fees, from [him]." *See* Exhibit "A" at § 5.2.

38.     He further agreed that upon termination of his employment with Aramark, he would re-review the Agreement and sign and remit a Certification of his compliance with the Agreement, no later than five (5) days after the effective date of his termination of employment. *See* Exhibit "A" at § 7.8.

39.     The Agreement is supported by valuable consideration in the form of,

among other things, the substantial retention bonus Steve Borgquist was eligible to receive had he remained employed through the three year anniversary of the acquisition of HPSI; the substantial salary he was offered and accepted; the Management Incentive Bonus Plan he participated in; his other compensation and benefits; the access to Aramark's trade secret, confidential and/or proprietary information he received; and the other significant benefits he received, including but not limited to those detailed in the offer letter he signed which accompanied the Agreement.  A true and correct copy of the offer letter is attached hereto as Exhibit "B."

## The Borgquists' Resignations and Unlawful Activities

40.     On or about June 22, 2018, Steve Borgquist informed David Lindahl that he was resigning his employment, and that his brother (Brent Borgquist) was resigning as well.

41.     David Lindahl asked Steve Borgquist whether he planned on starting a GPO.

42.     Steve Borgquist responded by saying "maybe" and that, if so, he would not initially target HPSI vendors, but rather would focus on other categories, such as insurance.

43.     In reality, and unbeknownst to Plaintiffs at the time, the Borgquists had been scheming **for at least eight (8) months** to target HPSI's customers and vendors, and had taken affirmative steps during that period of time to divert business away from HPSI and to their new venture.

44.     For example, Plaintiffs have learned that on October 25, 2017, while he was the Managing Director, Operations of HPSI, Steve Borgquist emailed himself what appears to be a draft email addressed to "Jacob".  Upon information and belief, "Jacob" is Jacob Christenson, the son of Christopher Christenson, the owner and founder of Ensign Group, Inc. ("Ensign"), which owns more than 250 independently

operated nursing homes, senior living facilities, in-house therapy and skilled nursing businesses across the country.  A true and correct copy of this email is attached hereto as Exhibit "C."

45.     Upon information and belief, Jacob Christenson is an investor in Banner.

46.     The subject line of Steve Borquist's draft email to "Jacob" is "Projections - CONFIDENTIAL."  *See* Exhibit "C."

47.     Steve Borquist's October 25, 2017 email attached an Excel spreadsheet with "first year revenue projections (beginning after contracts are secured)."  *See* Exhibit "C."

48.     The spreadsheet (not attached to the Complaint because the information contained therein is confidential) refers to HPSI customers by their initials (e.g., "Chain Partner 1A," "Chain Partner 2E," etc.) and includes detailed financial information setting forth projected first year revenues for each "Chain Partner," along with individual tabs corresponding to each customer containing further detail on the number of beds at each individual nursing home, senior living or other facility; the start date for each facility; and the total projected revenues for each facility, broken down by the source of revenue.

49.     The information for the "Chain Partners" in Steve Borquist's October 25, 2017 email to "Jacob" comes directly from HPSI's own financial and customer records for the customers who are referred to by their initials – *i.e.*, the projections are based on actual HPSI results for nine of HPSI's existing customers.

50.     In the text of the email, Steve Borquist reveals that he "only included groups that have expressed a level of interest."  Thus, at a time when he was the Managing Director, Operations, of HPSI – and a full eight months *before* he resigned his employment – Borquist had already discussed *with nine of HPSI's existing customers* whether those customers would follow him to a competing venture.  *See* Exhibit "C."

51.     Perhaps not realizing that he had unwittingly admitted in the preceding

sentence having breached his duty of loyalty (among other obligations) to HPSI, Borgquist's email goes on to say:  "I haven't been approaching groups at all (current duty of loyalty) so this doesn't include all the groups and independents we will work to align."  *See* Exhibit "C."

52.    The email goes on to reference that Steve Borgquist already had the "commitment" of another one of HPSI's existing customers, and references how by working with the "PE guys" (in this case, not "private equity" but, rather a reference to this other customer and Ensign), the competing venture could leverage those two customers' preferred pricing with another GPO (Medline) right away.  *See* Exhibit "C."

53.    In addition to discussing with Jacob his preferred ownership stake, Steve Borgquist goes on to say that "Q1 2018" is the target start date for the competing venture.  *See* Exhibit "C."

54.    Plaintiffs only discovered this email after the Borgquists' resignations because Steve Borgquist forwarded Brent Borgquist his draft email to "Jacob" on October 27, 2017 at Brent Borgquist's hpsionline.com (*i.e.*, work) email address.

55.    Upon information and belief, there are numerous other communications between Steve Borgquist and Brent Borgquist and/or related to their scheme to form a competing GPO and pirate away HPSI's customers in the months leading up to their resignations which have been sent to/received on their personal email addresses and/or other electronic devices, and are at this time unknown to Plaintiffs.

56.    In the time since the Borgquists' resignations of employment, Plaintiffs have discovered other evidence demonstrating that the Borgquists were engaged in classic double-dealing during the latter part of their employment.

57.    By way of example, since 1999 HPSI's relationship manager for the Ensign account was Dick MacFarlane, a 30-year HPSI employee with strong relationships throughout that account.

58.    Months before the Borgquists resigned, Steve Borgquist increased Brent

Borgquist's involvement with the Ensign account at the national level, decreasing Dick McFarlane's role correspondingly.

59.     Upon information and belief, Steve Borgquist increased his brother's involvement with the Ensign account at the national level – and in coordination with Brent took affirmative steps to "freeze out" Mr. MacFarlane from this account – for the sole purpose of helping Brent Borgquist build a stronger relationship with what was known by the Borgquists at the time to be their own future customer, Ensign, once they resigned their employment with HPSI.

60.     Banner Purchasing LLC was formed as a Nevada limited liability company on July 9, 2018, with Steve Borgquist listed as Manager.  True and correct copies of the filing and subsequent registration in California are attached as Exhibit "D."

61.     According to the California Secretary of State's Statement of Information, Banner is a GPO.  *See* Exhibit "D."

62.     Prior to their coordinated resignations of employment to form a competing venture (Banner), the Borquists, among other unlawful activities:

- Abused their positions of trust and confidence (in the case of Steve Borgquist, his position as the Managing Director, Operations, running HPSI) to plan, scheme and recruit customers and at least one investor for a competing venture;

- Affirmatively took steps in the form of communicating with, upon information and belief, at least nine existing HPSI customers about their competing venture and securing a "level of interest" from those customers;

- Upon information and belief, shared with a third-party ("Jacob") trade secret, confidential and/or proprietary customer and financial information belonging to HPSI with the details of HPSI's performance with actual customers;

- Recruited one another and, upon information and belief, others at HPSI to join their competing venture; and

- Engaged in other acts of disloyalty, breaches of contract (in the case of Steve Borgquist), breaches of their fiduciary duties, acts of tortious interference with contract, and acts of tortious and negligent interference with HPSI's prospective economic advantages with customers and vendors.

63.     Upon information and belief, in the months since their coordinated resignations, the Borgquists have continued to solicit additional HPSI employees to join their competing venture.

64.     Upon resigning his employment, Steve Borgquist wiped his HPSI computer of any and all data.

65.     Since their coordinated resignations, at least 10 of HPSI's current vendors have reported to HPSI that the Borgquists, through Banner, have reached out to them in an attempt to establish business relationships with those vendors.

## FIRST CAUSE OF ACTION
### Breach of Written Contract
### (Against Defendant Steve Borgquist)

66.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 65, inclusive, with the same force and effect as though fully set forth herein.

67.     The Agreement signed by Steve Borgquist is a valid and enforceable contract supported by adequate consideration, and Plaintiffs have satisfied any conditions precedent to its enforcement.  *See* Exhibit "A."

68.     The Agreement contains lawful, enforceable provisions relating to Steve Borgquist's conduct and activities during the course of his employment with HPSI. *See*, *e.g.*, §§ 1.1, 1.3, 2, 3.1, 3.2, 3.3, 3.4, 3.5, 4.1, 5.2 and 7.8.

69.     As set forth above, Steve Borgquist has violated the terms of the Agreement, among other ways by planning, organizing, and soliciting customers and investors for a competing venture while still employed by Plaintiffs; using for his own benefit and disclosing to at least one individual outside of the company Plaintiffs' trade secret, confidential and/or proprietary information; recruiting one or more HPSI employee to join a competing venture, including his brother, Brent Borgquist; and otherwise engaging in affirmative acts inconsistent with his obligations under the Agreement, including but not limited to those set forth in sections 1.1, 1.3, 2, 3.1, 3.2,

3.3, 3.4, 3.5, 4.1, 5.2 and 7.8 of the Agreement.

70.     In addition to his actions while still employed by Plaintiffs, Steve Borgquist has continued to breach the Agreement following termination of his employment by, among other things, recruiting HPSI employees and using and/or disclosing trade secret, confidential and/or proprietary information belonging to Plaintiffs.

71.     As a result of Steve Borgquist's breaches of the Agreement, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

72.     Moreover, Steve Borgquist has been unjustly enriched as a result of his breaches of the Agreement.

## SECOND CAUSE OF ACTION
### Breach of Duty of Loyalty
**(Against Defendants Steve Borgquist and Brent Borgquist)**

73.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 72, inclusive, with the same force and effect as though fully set forth herein.

74.     The Borgquists were each employed in positions of trust and confidence.

75.     Plaintiffs manifested assent to each of the Borgquists to act on Plaintiffs' behalf and subject to Plaintiffs' control.

76.     In accepting his position and role, each of the Borgquists consented to act on Plaintiffs' behalf and subject to Plaintiffs' control.

77.     Employed in a position of trust and confidence, the Borgquists each owed to Plaintiffs his undivided loyalty.

78.     Each of the Borgquists breached his own duty of loyalty by taking actions in direct competition with Plaintiffs during his employment, in the process transferring his loyalty from Plaintiffs to Banner.

79.     As a result of the Borgquists' breaches of their duties of loyalty, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at

1 trial.

2   80.   Plaintiffs seek punitive damages as the Borgquists' conduct has been

3 willful, wanton and malicious as described above.

4

5 **THIRD CAUSE OF ACTION**
**Tortious Interference with Contract**

6 **(Against Defendant Brent Borgquist and Banner Purchasing LLC)**

7   81.   Plaintiffs re-allege and incorporate herein by reference the allegations

8 contained in paragraphs 1 through 80, inclusive, with the same force and effect as

9 though fully set forth herein.

10   82.   At all relevant times, Steve Borgquist was a party to a valid, enforceable

11 contract with Plaintiffs (the Agreement).

12   83.   Brent Borgquist, as Steve Borgquist's brother and co-worker, had

13 knowledge of Steve Borgquist's contract with Plaintiffs.

14   84.   Steve Borgquist is the Managing Member, and the only officer, of

15 Banner.

16   85.   Accordingly, Banner also had knowledge of Steve Borgquist's contract

17 with Plaintiffs.

18   86.   Brent Borgquist and Banner have tortiously interfered with Steve

19 Borgquist's contract with Plaintiffs, the Agreement, by actively taking steps to disrupt

20 the Agreement and assist in the breach of the Agreement.

21   87.   The actions of Brent Borgquist and Banner have in fact resulted in the

22 actual disruption and further breach of the Agreement between Plaintiffs and Steve

23 Borgquist.

24   88.   As a result of Brent Borgquist's and Banner's interference with

25 Plaintiffs' contractual relationship with Steve Borgquist, Plaintiffs have suffered and

26 continue to suffer damages in an amount to be proven at trial.

27   89.   Brent Borgquist's and Banner's actions have been willful, wanton, and

28 malicious, and based on such actions, Plaintiffs seek punitive damages against each of

those Defendants.

## FOURTH CAUSE OF ACTION
### Intentional Interference with Prospective Business Advantage
### (Against all Defendants)

90.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 89, inclusive, with the same force and effect as though fully set forth herein.

91.     Plaintiffs enjoy numerous economic relationships with customers and vendors.

92.     These economic relationships are vital to the success of Plaintiffs' business and the relationships have fostered an economic benefit to Plaintiffs.

93.     Plaintiffs have had economic relationships with these customers and vendors for years, and it was highly probable that Plaintiffs' economic benefit resulting from these relationships would continue into the future.

94.     Defendants' actions in soliciting and recruiting Plaintiffs' vendors and customers, while employed by Plaintiffs, have interfered with Plaintiffs' relationship with these customers and vendors and have sent a message to the vendors and customers that Plaintiffs' business may be unstable.

95.     Defendants were aware of Plaintiffs' prospective economic advantage that resulted from Plaintiffs' economic relationships with its vendors and customers.

96.     Defendants knew that their solicitation and behind-the-scenes discussions with Plaintiffs' vendors and customers would interfere with Plaintiffs' prospective economic advantage.

97.     Defendants have intentionally interfered with Plaintiffs' business relationships with its customers and its vendors.

98.     Defendants' actions have disrupted and interfered with Plaintiffs' economic relationships with its customers and vendors.

99.     As a result of Defendants' intentional interference with Plaintiffs' economic relationships with its customers and vendors, Plaintiffs have suffered and

continue to suffer damages in an amount to be proven at trial.

100.   Defendants actions have been willful, wanton, and malicious, and based on such actions, Plaintiffs seek punitive damages against each of the Defendants.

**FIFTH CAUSE OF ACTION**
**Negligent Interference with Prospective Business Advantage**
**(Against all Defendants)**

101.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 100, inclusive, with the same force and effect as though fully set forth herein.

102.   As set forth in Plaintiffs' Fourth Cause of Action, Plaintiffs enjoy numerous economic relationships with customers and vendors.

103.   These economic relationships are vital to the success of Plaintiffs' business and the relationships have fostered an economic benefit to Plaintiffs.

104.   Plaintiffs have had economic relationships with these customers and vendors for years, and it was highly probable that Plaintiffs' economic benefit resulting from these relationships would continue into the future.

105.   Defendants' actions in soliciting and recruiting Plaintiffs' vendors and customers, while employed by Plaintiffs, have interfered with Plaintiffs' relationship with these customers and vendors and have sent a message to the vendors and customers that Plaintiffs' business may be unstable.

106.   Defendants were aware of Plaintiffs' prospective economic advantage that resulted from Plaintiffs' economic relationships with its vendors and customers.

107.   Defendants knew that their solicitation and behind-the-scenes discussions with Plaintiffs' vendors and customers would interfere with Plaintiffs' prospective economic advantage.

108.   Defendants failed to act with reasonable care as to Plaintiffs' economic relationships.

109.   Defendants' actions have disrupted and interfered with Plaintiffs'

COMPLAINT

economic relationships with its customers and vendors.

110.   As a result of Defendants' negligent interference with Plaintiffs' economic relationships with its customers and vendors, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

111.   Defendants actions have been willful, wanton, and malicious, and based on such actions, Plaintiffs seek punitive damages against each of the Defendants.

## SIXTH CAUSE OF ACTION
### Violation Of Unfair Competition Law Cal. Bus. & Prof. Code § 17200.
#### (Against Defendants)

112.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 111, inclusive, with the same force and effect as though fully set forth herein.

113.   Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful," "unfair" and "fraudulent" business practice.

114.   Section 17200 specifically prohibits any "unlawful . . . business act or practice."  Defendants have violated section 17200's prohibition against engaging in an unlawful business act or practice by, among other things, tortiously interfering with Steve Borgquist's Agreement with Plaintiffs as set forth above; intentionally interfering with Plaintiffs' prospective business advantages with its customers and vendors as set forth above; and negligently interfering with Plaintiffs' prospective business advantages with its customers and vendors as set forth above.

115.   Defendants' conduct caused and continues to cause substantial injury to Plaintiffs.  Plaintiffs have suffered injury in fact and lost money as a result of Defendants' unlawful conduct.

116.   Additionally, pursuant to California Business & Professions Code §17203, Plaintiffs seek an order requiring Defendants to immediately cease such acts of unlawful business practices and requiring Defendants to return to Plaintiffs the full

amount of money they have received as a result of their unlawful business practices.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray for judgment as follows:

1.     For general, special, consequential and incidental damages of more than $75,000, according to proof.

2.     For restitution and/or disgorgement of all money, profits, compensation or property Defendants have acquired or will acquire by any wrongful or unlawful means, including but not limited to all profits of Banner Purchasing.

3.     For exemplary and punitive damages.

4.     For costs of suit incurred herein.

5.     For attorney's fees, including, but not limited to, those provided for in the Agreement at section 5.2.

6.     For pre-judgment interest at the legal rate.


Dated: October 19, 2018          **DUANE MORRIS LLP**


                                 By:/s/ Cyndie M. Chang
                                    Cyndie M. Chang
                                    Angela Hebberd

                                    Attorneys for Plaintiffs

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury pursuant to Fed. R. Civ. P. 38.

3

4      Dated: October 19, 2018             **DUANE MORRIS LLP**

5

6                                          By:/s/ Cyndie M. Chang
                                           Cyndie M. Chang
7                                          Angela Hebberd

8                                          Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28