UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARAMARK MANAGEMENT, LLC, et al., | Case No. 8:18-cv-01888-JLS-KESx |
| Plaintiffs, | **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| STEVE BORGQUIST, et al., | |
| Defendants. | |

This Report and Recommendation ("R&R") is submitted to the Honorable Josephine L. Staton, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and the Court's referral (Dkt. 149).

1

**TABLE OF CONTENTS**

2   I. INTRODUCTION ...................................................................................4

3   II. LEGAL STANDARDS ...........................................................................7

4      A. Spoliation.......................................................................................7

5         1.  Whether State or Federal Law Applies. ....................................7

6         2.  The Duty to Preserve Evidence................................................8

7         3.  Sanctions for ESI Spoliation. ................................................10

8      B. Untimely Production of Documents...............................................15

9   III. DISCUSSION .....................................................................................16

10     A. Overview of the Alleged Spoliation...............................................16

11     B. When Defendants' Duty to Preserve Evidence Arose. ...................18

12        1.  Defendants Actually Anticipated Litigation When They Deleted HPSI-

13            Related Emails in Late June or Early July 2018. ....................18

14        2.  The Court Need Not Decide Whether the Borgquists Reasonably Should

15            Have Anticipated Litigation Before They Deleted the Emails in Late June

16            or Early July 2018. .................................................................25

17     C. Whether Defendants Should Be Sanctioned for ESI Spoliation. ....25

18        3.  The Jury Should Be Instructed to Presume that the Emails Deleted in Late

19            June or Early July 2018 Were Unfavorable to Defendants. .....26

20        4.  The Jury Should Decide Whether the Borgquists Intentionally Spoliated

21            Text Messages. .......................................................................28

22        5.  The Jury Should Decide Whether Brent Intentionally Spoliated His Dell

23            Laptop By Recycling It in July 2019. .....................................34

24        6.  The Jury Should Decide Whether Brent Intentionally Spoliated His

25            iPhone By Trading It in to the Verizon Store in September 2019............38

26        7.  Steve's iPhone, Which Was Not Examined in the Manner Provided by the

27            ESI Examination Order. ..........................................................39

28     D. Untimely Production of Physical Documents Given to Plaintiffs' Prior

1

Counsel. ...................................................................................... 42

2        1.  Factual Background. .................................................................. 42

3        2.  Discussion. ............................................................................... 44

4    E.  To Cure the Prejudice Due to ESI Spoliation, Plaintiffs Should Be Awarded

5        Attorney's Fees Incurred in Bringing the Instant Motion. ............................ 46

6   IV. RECOMMENDATION ...................................................................... 47

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## INTRODUCTION

In the operative First Amended Complaint ("FAC" at Dkt. 24), Plaintiffs Aramark Management, LLC ("Aramark") and HPSI Purchasing Services, LLC ("HPSI" and collectively, "Plaintiffs") allege that while working in high-level positions[1] for HPSI, brothers Steve and Brent Borgquist misappropriated HPSI's confidential information and used it to start a competing group purchasing organization ("GPO") with former HPSI customers.  The Borgquists' competing business was initially called Banner Purchasing and was later called Beacon Purchasing, LLC ("Beacon").  Plaintiffs are suing the Borgquists and Beacon (collectively, "Defendants") for breach of contract, breach of their duty of loyalty, interference with prospective economic advantage, and unfair business practices.[2]

Plaintiffs filed their first motion to compel discovery from Defendants in August 2019, which the Court granted.  (Dkt. 67, 71, 75, 76.)  Around the same time, Defendants sought to quash 21 document subpoenas Plaintiffs had served on non-parties involved in the formation of Beacon.  (Dkt. 68, 70, 72.)  Defendants

---

[1] From and after the late summer of 2017, Steve Borgquist was the acting Managing Director of Operations for HPSI, the equivalent of HPSI's CEO.  Brent Borgquist was among HPSI's most successful Purchasing Consultants, twice ranking #1 in the company sales.  (Mot. at 14; Hess Decl. ¶¶ 6-8 / Dkt. 143-6 at 2.) Both gave notice of their resignation from HPSI on June 22, 2018, and their last day of employment with HPSI was July 2, 2018.  (Brent Depo., Opp'n Ex. C / Dkt. 164-1 at 30-31.)

[2] The operative FAC brings the following claims: (1) breach of contract against Steve Borgquist (FAC ¶¶ 65-71), (2) breach of a duty of loyalty against Steve and Brent (id. at ¶¶ 72-79), (3) tortious interference with contract against Brent and Banner (id. at ¶¶ 80-88), (4-5) intentional and negligent interference with prospective business advantage against all Defendants (id. at ¶¶ 89-110), (6) unfair competition under California law against all Defendants (id. at ¶ 111-15).  The District Judge recently denied Plaintiffs' motion to amend the FAC to add a breach of contract claim against Brent.  (Dkt. 193.)

4

argued that the subpoenas were overbroad because they sought documents concerning the Borgquists' conduct after they left HPSI, as well as "trade secrets and proprietary information of Beacon ... and its agents...."  (Dkt. 70 at 2-3.) Plaintiffs argued that the subpoenas were necessary because, in response to requests for production ("RFPs") served on Defendants, Defendants claimed to have very few responsive documents.  (Dkt. 72.)  Plaintiffs noted that Defendants could not "explain why certain ESI – including an email Steve Borgquist sent to Beacon's other member, Jacob Christensen, eight months before the Borgquists resigned their employment with Plaintiffs, containing detailed sales and other information about HSPI's customers ... – is not in Defendants' possession, custody, or control."  (Id. at 2.)  The Court denied Defendants' motion to quash and directed the non-parties to respond to the subpoenas.  (Dkt. 80.)

In January 2020, Plaintiffs filed another motion to compel.  (Dkt. 101.) Based on the documents subpoenaed from non-parties, Plaintiffs alleged that Defendants had "withheld or spoliated relevant and material evidence" concerning the formation of Beacon.  (Id. at 7.)  After being ordered to meet and confer with Plaintiffs about the motion (Dkt. 108), Defendants stipulated to a forensic examination of their electronically stored information ("ESI").  (Dkt. 113.)  On February 19, 2020, the Court ordered Defendants to: (1) supplement their written responses to certain discovery, including to Plaintiffs' second RFP, and (2) make their "personal and work-related electronic devices (including cell phones, tablets, desktops, and laptops)" available for a forensic examination ("ESI Examination Order" at Dkt. 117).

In August 2020, Plaintiffs filed the present motion seeking sanctions against Defendants ("Motion" at Dkt. 143).  Plaintiffs argue that the forensic examination conducted pursuant to the ESI Examination Order revealed that the Borgquists spoliated ESI by deleting emails, failing to turn off an automatic delete function for text messages, and failing to retain personal cell phones and a laptop.  Plaintiffs

also argue that Defendants failed to produce timely a physical box of responsive documents, which Steve[3] gave to former defense counsel John E. Lattin around the time the lawsuit was filed.  The deletion of emails occurred prior to the lawsuit being filed, but the other alleged spoliation began or continued after the lawsuit was filed.

Plaintiffs seek the following sanctions: (1) an adverse inference instruction to the jury to presume that the spoliated ESI was unfavorable to Defendants, (2) reasonable expenses incurred to bring the Motion, and (3) an Order to Show Cause why additional sanctions should not be issued against Defendants and their former counsel Mr. Lattin.  (Dkt. 143-7.)

The District Judge referred the motion to the undersigned Magistrate Judge for an R&R.  (Dkt. 149.)  Defendants opposed the Motion ("Opposition" at Dkt. 164) and Plaintiffs replied ("Reply" at Dkt. 170).  On October 13, 2020, the parties argued the Motion at a telephonic hearing before the Magistrate Judge.  (Dkt. 174.)

On October 27, 2020, at the Court's request, Mr. Lattin filed a declaration addressing Plaintiffs' arguments concerning untimely production of the box of hardcopy documents.  (Dkt. 175, 178.)  After Plaintiffs filed a response (Dkt. 180), Mr. Lattin filed a supplemental declaration (Dkt. 183).

For the reasons discussed below, it is recommended that:

(a) Spoliation sanctions in the form of an adverse inference jury instruction are appropriate for the Borgquists' deletion of emails in late June or early July 2018, because the preponderance of the evidence shows that the Borgquists actually anticipated litigation at that time;

(b) The Borgquists failed to take reasonable measures to preserve text

---

[3] Although the Court would typically refer to the individual Defendants by their surnames, for the sake of clarity, the Court will refer to the Borgquists individually as "Steve" and "Brent."

messages on their cell phones, as well as ESI on Brent's personal laptop and iPhone, and the jury should be allowed to decide if they did so with the intent to deprive Plaintiff of the ESI's use in litigation;[4]

(c) Based on Defendants' failure to have Steve's iPhone examined in the manner directed in the ESI Examination Order, Defendants should bear the cost of Plaintiffs having the iPhone forensically examined by Driven or another mutually agreed-upon vendor, if Plaintiffs so choose;

(d) Based on the failure of former defense counsel Mr. Lattin to produce the box of documents in Steve's garage or disclose its existence in written responses to RFPs, Mr. Lattin's law firm should bear the cost of Plaintiffs conducting an additional 3-hour deposition of Steve, if Plaintiffs so choose; and

(e) Defendants, the law firm of current defense counsel, and the law firm of former defense counsel Mr. Lattin should be jointly and severally liable to Plaintiffs for the reasonable expenses they incurred in bringing the instant motion, including attorney's fees.

## II.

## LEGAL STANDARDS

**A.**   **Spoliation.**

**1.**   **Whether State or Federal Law Applies.**

Diversity of citizenship is the basis of federal subject matter jurisdiction in this case.  (FAC ¶¶ 6-7); 28 U.S.C. § 1332(a).  The Court is aware of some cases holding that in diversity cases, state law determines a party's duty to preserve evidence but federal rules govern sanctions for breach of that duty.  See State Farm Fire & Cas. Co. v. Broan Mfg. Co., 523 F. Supp. 2d 992, 995 (D. Ariz. 2007)

---

[4] The Court anticipates that the parties will submit specific proposed language for the jury instructions discussed in this R&R, pursuant to the District Judge's standard pre-trial procedures.

1   (citing <u>Allstate Ins. Co. v. Sunbeam Corp.</u>, 53 F.3d 804, 806 (7th Cir. 1995)).  The

2   Ninth Circuit, however, has applied federal law when addressing spoliation in

3   diversity litigation.  <u>See</u> <u>Glover v. BIC Corp.</u>, 6 F.3d 1318, 1329 (9th Cir. 1993)

4   ("A federal trial court has the inherent discretionary power to make appropriate

5   evidentiary rulings in response to the destruction or spoliation of relevant

6   evidence."); <u>accord</u> <u>Adkins v. Wolever</u>, 554 F.3d 650, 652 (6th Cir. 2009)

7   (reasoning that "the authority to impose sanctions for spoliated evidence arises not

8   from substantive law but, rather, "from a court's inherent power to control the

9   judicial process" and "a spoliation ruling is evidentiary in nature and federal courts

10  generally apply their own evidentiary rules in both federal question and diversity

11  matters"); <u>Silvestri v. Gen. Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001); <u>Reilly</u>

12  <u>v. Natwest Mkts. Group Inc.</u>, 181 F.3d 253, 267 (2d Cir. 1999).  Additionally, in

13  the briefing on the current Motion, the parties cite federal law.  (Mot. at 4; Opp'n at

14  3.[5])  This Court therefore will apply federal law to the spoliation issue.

15          **2.      The Duty to Preserve Evidence.**

16          The "duty to preserve arises when a party knows or should know that certain

17  evidence is relevant to pending or future litigation."  <u>Surowiec v. Cap. Title</u>

18  <u>Agency, Inc.</u>, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (citation omitted).  "Stated

19  differently, the duty to preserve is triggered not only during litigation, but also

20  extends to the period before litigation when a party should reasonably know that

21  evidence may be relevant to anticipated litigation."  <u>Id.</u> (citation and quotation

22  marks omitted).  The anticipated litigation need not be certain or imminent.  <u>In re</u>

23  <u>Napster, Inc. Copyright Litig.</u>, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006)

24  (holding that imminence is "sufficient, rather than necessary, to trigger the duty to

25  preserve documents").  Rather, the duty is triggered when one knows or reasonably

26  _____

27          [5] Citations to court documents generally refer to the pagination imposed by
    the Court's e-filing system.

28

1   should know that future litigation is "'probable,' which has been held to mean
2   'more than a possibility.'"  Id. (citation omitted).

3       Evidence that a defendant *actually* anticipated litigation might include emails
4   or meeting minutes discussing potential litigation, actions taken to retain a lawyer,
5   or a company budget that allocates funds for potential litigation.  See, e.g., Nation
6   v. Ducey, No. 15-01135, 2016 U.S. Dist. LEXIS 174974 at *18-19, 2016 WL
7   7338341 at *7 (D. Ariz. Dec. 19, 2016) (finding department of gaming actually
8   anticipated litigation where meeting minutes showed a discussion of a possible
9   tortious interference claim and the department asserted work product protection for
10  documents created during that time period).

11      When a defendant *should have reasonably* anticipated litigation involves
12  applying "a flexible fact-specific standard that allows a district court to exercise the
13  discretion necessary to confront the myriad factual situations inherent in the
14  spoliation inquiry."  Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed.
15  Cir. 2011) (citing Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir.
16  2001)).  It "is informed by a number of policy considerations, including 'the need to
17  preserve the integrity of the judicial process in order to retain confidence that the
18  process works to uncover the truth,' ... and must balance the reality that 'litigation
19  is an ever-present possibility in American life,' ... with the legitimate business
20  interest of eliminating unnecessary documents and data."  Hynix Semiconductor
21  Inc. v. Rambus Inc., 645 F.3d 1336, 1345 (Fed. Cir. 2011) (quoting Silvestri, 271
22  F.3d at 590 and Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Murray Sheet Metal
23  Co., 967 F.2d 980, 984 (4th Cir. 1992)).

24      In some cases, as occurred here, the future plaintiff may send a preservation
25  letter.  ("Preservation Letter," Mot. Ex. DD / Dkt. 143-5 at 22.)  However, "a future
26  litigant is not required to make such a request, and a failure to do so does not vitiate
27  the independent obligation of an adverse party to preserve such information if the
28  adverse party knows or should know of impending litigation."  Apple, Inc. v.

9

Samsung Elecs. Co., Ltd., 881 F. Supp. 2d 1132, 1136-37 (N.D. Cal. 2012) (citation and quotation marks omitted).  Thus, even if a preservation letter is sent, the duty to preserve evidence may arise earlier.  See, e.g., Small v. Univ. Med. Ctr., No. 13-0298, 2018 U.S. Dist. LEXIS 134716 at *200-01, 2018 WL 3795238 at *59 (D. Nev. Aug. 9, 2018) ("Arguably, UMC was on notice of the potential for litigation months earlier" than the preservation letter).

### 3. Sanctions for ESI Spoliation.

    a.    The Court's Inherent Authority to Sanction Spoliation and Authority Under Rule 37(e) to Sanction ESI Spoliation.

Spoliation occurs when a party destroys, significantly alters, or fails to preserve evidence after its duty to preserve arose.  See United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002); see also Apple, Inc. v. Samsung Elecs. Co., 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).  Typically, district courts can sanction spoliation under their inherent authority to sanction abusive litigation tactics or under Federal Rule of Civil Procedure 37.  Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006); Fed. R. Civ. P. 37(b)(2)(A) (listing examples of sanctions that may be imposed upon a party who "fails to obey an order to provide or permit discovery").

If, however, the spoliation involves ESI, then Rule 37(e) provides the most appropriate and, some authority holds, the exclusive framework for imposing sanctions.  Long Nguyen v. Lotus by Johnny Dung, Inc., No. 17-1317-JVS-JDEx, 2019 U.S. Dist. LEXIS 77821 at *12, 2019 WL 1950294 at *4 (C.D. Cal. Mar. 14, 2019) (citing Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015 Amendment); see also Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2284.2 (3d ed.) ("Although the 2006 rule applied only to 'sanctions under these rules,' the 2015 provision supplants inherent authority, which courts sometimes invoked to address preservation problems when rule provisions did not seem pertinent.").  But see Hugler v. Sw. Fuel Mgmt., Inc., No. 16-4547-FMO-AGRx, 2017 U.S. Dist.

LEXIS 225593 at *22-23, 2017 WL 8941163 at *8 (C.D. Cal. May 2, 2017) (reasoning that courts' inherent authority "cannot be limited by a body such as the Advisory Committee" and "it would be poor public policy to require the courts to rely solely upon the Rules" because "almost all documents are now electronically stored, and destruction or alteration of electronically stored documents often occurs").  Because this R&R relies on the Court's authority under Rule 37(e), it does not decide whether the Court could also sanction the parties for spoliation of ESI under its inherent authority.

                **b.**     **Rule 37(e) Framework.**

Rule 37(e), as amended in 2015, provides in full as follows:

(e) Failure to Preserve Electronically Stored Information.  If electronically stored information that should have been preserved in the anticipation or conduct of litigation[6] is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

    (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

    (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

        (A) presume that the lost information was unfavorable to the party;

        (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

---

    [6] Rule 37(e)'s phrase "should have been preserved in the anticipation or conduct of litigation" codifies the duty to preserve evidence when litigation is reasonably foreseeable as established by case law.  Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015 Amendment.

1           (C) dismiss the action or enter a default judgment.

2 Fed. R. Civ. P. 37(e).

3       Thus, there are two levels of sanctions available under Rule 37(e).  In the

4 first level under Rule 37(e)(1), upon finding that (1) a party had a duty to preserve

5 ESI and (2) breached that duty, (3) causing a prejudicial loss of ESI, the court may

6 order measures no greater than necessary to cure the prejudice.  In the second level

7 under Rule 37(e)(2), the court may impose more severe sanctions – including a

8 negative inference instruction – if it finds that the spoliating party "acted with the

9 intent to deprive another party of the information's use in the litigation."  Fed. R.

10 Civ. P. 37(e)(2).

11           c.     Sanctions Under Rule 37(e)(1).

12       Regarding the prejudice element of Rule 37(e)(1), the Advisory Committee

13 Notes opine as follows:

14       An evaluation of prejudice from the loss of information necessarily

15       includes an evaluation of the information's importance in the

16       litigation.  The rule does not place a burden of proving or disproving

17       prejudice on one party or the other.  Determining the content of lost

18       information may be a difficult task in some cases, and placing the

19       burden of proving prejudice on the party that did not lose the

20       information may be unfair.  In other situations, however, the content

21       of the lost information may be fairly evident, the information may

22       appear to be unimportant, or the abundance of preserved information

23       may appear sufficient to meet the needs of all parties.  Requiring the

24       party seeking curative measures to prove prejudice may be reasonable

25       in such situations.  The rule leaves judges with discretion to determine

26       how best to assess prejudice in particular cases.

27 Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment.

28       Courts have noted similar concerns, finding, "The prejudiced party must not

be held 'to too strict a standard of proof regarding the likely contents of the

destroyed or unavailable evidence,' because doing so 'would allow parties who

have destroyed evidence to profit from that destruction.'" <u>Ottoson v. SMBC</u>

<u>Leasing & Fin., Inc.</u>, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017) (citation omitted).

If the destruction of evidence was intentional, courts generally place the burden on

the destroyer to show that the loss of the evidence was *not* prejudicial.  <u>See</u>, <u>e.g.</u>,

<u>Mfg. Automation & Software Sys., Inc. v. Hughes</u>, No. 16-8962-CAS-KSx, 2018

U.S. Dist. LEXIS 227206 at *32, 2018 WL 5914238 at *11 (C.D. Cal. Aug. 20,

2018) (citing <u>Czuchaj v. Conair Corp</u>, No. 13-cv-1901, 2016 WL 4130946 at *2

(S.D. Cal. May 3, 2016) and <u>Apple Inc. v. Samsung Elecs. Co.</u>, 888 F. Supp. 2d at

998).

A finding of breach and prejudice under Rule 37(e)(1) is sufficient for the

court to "allow[] the parties to present evidence to the jury concerning the loss and

likely relevance of information and instructing the jury that it may consider that

evidence, along with all the other evidence in the case, in making its decision," as

long as this is "no greater than necessary to cure prejudice."  Fed. R. Civ. P. 37,

Advisory Committee Notes to 2015 Amendment.

d.      Sanctions Under Rule 37(e)(2).

For the court to "instruct[] a jury that it may draw an adverse inference from

the loss of the information," there must be a finding that the spoliating party acted

with the intent to deprive another party of the information's use in the litigation.  <u>Id.</u>

"[N]either the Rule itself nor the Ninth Circuit have provided a definition of

'intent' in this context."  <u>Estate of Moreno by & through Moreno v. Corr.</u>

<u>Healthcare Cos., Inc.</u>, No. 18-5171, 2020 U.S. Dist. LEXIS 108370 at *17, 2020

WL 5740265 at *6 (E.D. Wash. June 1, 2020).  The Advisory Committee notes

indicate that negligent or even grossly negligent behavior is insufficient to support

sanctions under Rule 37(e)(2).  <u>See</u> Fed. R. Civ. P. 37, Advisory Committee Note to

2015 Amendment (rejecting <u>Residential Funding Corp v. DeGeorge Financial</u>

13

Corp., 306 F 3d 99 (2d Cir. 2002)).  "Accordingly, courts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that the ... party purposefully destroyed evidence to avoid its litigation obligations."  Porter v. City & Cty. of San Francisco, No. 16-03771-CW-DMR, 2018 U.S. Dist. LEXIS 151349 at *8, 2018 WL 4215602 at *3 (N.D. Cal. Sept. 5, 2018) (collecting cases).

The Advisory Committee Notes to Rule 37 contemplate that a district court may allow a jury to decide whether a party who spoliated evidence acted with the necessary intent under Rule 37(e)(2), explaining:

> Subdivision (e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in the litigation.  This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial.
>
> [¶] If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation.  If the jury does not make this finding, it may not infer from the loss that the information was unfavorable to the party that lost it.

Fed. R. Civ. P. 37, Advisory Committee Note to 2015 Amendment; see, e.g., Epicor Software Corp. v. Alt. Tech. Sols., Inc., No. 13-00448-CJC-JCGx, 2015 U.S. Dist. LEXIS 187180 at *4, 2015 WL 12734011 at *2 (C.D. Cal. Dec. 17, 2015) (allowing parties to present disputed evidence of spoliation to the jury where the issue of intent was "an open question of fact" upon which "reasonable trier[s] of fact" could disagree).

1          e.      Standard of Proof.

2          In making factual findings to support the imposition of spoliation sanctions,

3    courts in the Ninth Circuit apply a preponderance of the evidence standard.  See

4    Compass Bank v. Morris Cerullo World Evangelism, 104 F. Supp. 3d 1040, 1052-

5    53 (S.D. Cal. 2015) ("the applicable standard of proof for spoliation in the Ninth

6    Circuit appears to be by a preponderance of the evidence"); Napster, 462 F. Supp.

7    2d at 1072 (finding "no Ninth Circuit authority applying the clear and convincing

8    standard to the exercise of the court's inherent authority to impose dismissal or

9    default sanctions, and the Ninth Circuit has not squarely addressed the issue of

10   which standard of proof is appropriate").

11   **B.     <u>Untimely Production of Documents.</u>**

12         Upon service of RFPs under Rule 34, the responding party must respond in

13   writing within 30 days either by stating that inspection or copying will be permitted

14   or by objecting.  Fed. R. Civ. P. 34(b)(2)(A)-(B).  The production "must then be

15   completed no later than the time for inspection specified in the request or another

16   reasonable time specified in the response."  Fed. R. Civ. P. 34(b)(2)(B).  After

17   responding to an RFP, a party must supplement its disclosure or response "in a

18   timely manner if the party learns that in some material respect the disclosure or

19   response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).

20         If a party fails to respond to an RFP, provides an evasive or incomplete

21   response, or fails to produce documents, then the party seeking discovery may

22   move to compel disclosures and seek sanctions.  Fed. R. Civ. P. 37(a)(3)-(4).  If the

23   motion is granted, then the moving party may typically recover the fees reasonably

24   incurred to bring the motion.  Fed. R. Civ. P. 37(a)(5)(A).

25         If a party fails to obey a discovery-related court order, then the Court may

26   impose sanctions that include shifting fees, directing an adverse finding, limiting

27   the disobedient party's evidence, striking the disobedient party's filings, and

28   holding the disobedient party in contempt.  Fed. R. Civ. P. 37(b)(2).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.**

**DISCUSSION**

**A.**     **Overview of the Alleged Spoliation.**

In or around March 2018, while Steve and Brent Borgquist were still employed by HPSI, they retained their brother Matthew Borgquist as counsel to help negotiate an operating agreement for their new company, which became Beacon.  (Mot. Ex. AA / Dkt. 143-5 at 3-6 [Matthew's deposition testimony].)

On June 22, 2018, Steve and Brent announced that they were resigning from HPSI, and they left HPSI on July 2, 2018.  (Borgquist Decls. ¶ 1 / Dkt. 164-1 at 65, 69; Mot. Ex. FF / Dkt. 143-5 at 36.)  On July 9, 2018, they signed an operating agreement for Beacon and retained a company called Ensign Services to provide certain "back office" functions for Beacon, including legal representation.  (Mot. at 15; Mot. Ex. BB / Dkt. 143-5 at 11-12.)

In late June or early July 2018, the Borgquists deleted HPSI-related emails from their personal email accounts.  (Mot. at 12; Steve and Brent Depos., Mot. Exs. J-K / Dkt. 143-3 at 11-21; Opp'n Ex. B-C / Dkt. 164-1 at 24, 30-31.)

On August 3, 2018, Defendants sent the Borgquists the Preservation Letter. (Mot. Ex. DD / Dkt. 143-5 at 22-34.)  On August 14, 2018, the Borgquists responded to the Preservation Letter through counsel.  (Mot. Ex. EE / Dkt. 143-5 at 36-37.)  Plaintiffs filed the instant lawsuit on October 19, 2018.  (Dkt. 1.)

In February 2019, Plaintiffs propounded their first set of RFPs.  (Mot. Ex. GG / Dkt. 143-5 at 44-45.)  In March 2019, Defendants responded with objections. (Mot. Ex. HH / Dkt. 143-5 at 47-48.)  In June 2019, after counsel met and conferred over the objections, Defendants served supplemental responses.  (Mot. Ex. II / Dkt. 143-5 at 53-55.)

In July 2019, Brent recycled a personal Dell laptop that he had used while employed at HPSI.  According to Brent, the laptop was inoperable.  (Mot. at 13; Mot. Exs. O, P / Dkt. 143-4 at 7, 10-11.)

In August 2019, after counsel again met and conferred over Defendants'
responses to Plaintiffs' RFPs, Defendants served second supplemental responses to
the RFPs.  (Dkt. 101-10 at 110-19.)

In September 2019, Brent took a personal iPhone that he had used while
employed at HPSI and sold it back to Verizon.  (Mot. at 13; Mot. Exs. O, P / Dkt.
143-4 at 7, 10-11.)

In September or October 2019, Plaintiffs served documents subpoenas on
non-parties who Plaintiffs believed were involved in the formation of Beacon.
(Dkt. 80; Dkt. 101-1 at 8-9.)

In January 2020, Plaintiffs filed a motion to compel Defendants to produce
further documents responsive to their RFPs, and after the parties were ordered to
meet and confer about the motion, Defendants stipulated to a forensic examination
of their ESI.  (Dkt. 101, 108, 113.)  In February 2020, the Court entered the ESI
Examination Order, which directed Defendants to: (1) supplement their written
responses to certain discovery, including to Plaintiffs' second RFP, and (2) make
their "personal and work-related electronic devices (including cell phones, tablets,
desktops, and laptops)" available for a forensic examination.  (Dkt. 117.)

At a deposition in July 2020, Steve Borguist testified that he had given a
box of hardcopy documents to the Borguists' prior counsel, John Lattin, around
the time that this lawsuit was filed in October 2018.  (Mot. at 8-9, 15-16; Mot. Ex.
FF / Dkt. 143-5 at 40-42.)  Mr. Lattin had not previously disclosed the existence of
this box to Plaintiffs' counsel, because he did not consider the documents
responsive to Plaintiffs' RFPs.  (Mot. at 16; Lattin Decl. ¶ 8 / Dkt. 178 at 3; Lattin
Suppl. Decl. ¶ 12 / Dkt 183 at 5.)  Current defense counsel produced the documents
in late July, several days after the discovery cut-off.  (Opp'n at 12; Dkt. 133.)

At the July 2020 deposition, Steve also testified that he had a personal, non-
operable iPhone in his possession that he had used during the relevant time period.
(Reply Ex. 1 / Dkt. 170-2 at 11.)  Defense counsel initially agreed to have the

17

iPhone examined pursuant to the ESI Examination Order, but ultimately had the
iPhone examined by a different company without Plaintiffs' knowledge.  (Reply
Ex. 2 / Dkt. 170-2 at 14-24; Setec Decl. / Dkt. 164-1 at 74.)

During the entire time period described above, the Borgquists never disabled
a 30-day automatic delete function for text messages on their personal cell phones.
(Mot. at 12-13; Mot. Exs. L-M / Dkt. 143-3 at 23-30; Mot. Ex. N / Dkt. 143-4 at 2-
4.)

**B.** **When Defendants' Duty to Preserve Evidence Arose.**

A threshold question in this dispute, as in most spoliation disputes, is when
Defendants' duty to preserve evidence arose.  As discussed above, the duty to
preserve arises when a party actually anticipated or reasonably should have
anticipated litigation.  See Apple, 881 F. Supp. 2d at 1136; Napster, 462 F. Supp.
2d at 1068.

Plaintiffs argue that Defendants should have reasonably anticipated litigation
in January 2018, when Defendants took steps to form Beacon by circulating a
business plan and sharing HPSI information.  (Mot. at 21.)  Plaintiffs argue that the
Borgquists were sophisticated parties who should have known that "the
surreptitious planning and transfer of loyalty to a competing business would likely
result in litigation."  (Id.)  Defendants argue that the duty to preserve did not arise
until they received the Preservation Letter in August 2018.  (Opp'n at 8.)

**1.** **Defendants Actually Anticipated Litigation When They Deleted
HPSI-Related Emails in Late June or Early July 2018.**

a.      Evidence.

On October 25, 2017, Steve Borgquist emailed Jacob Christensen, a friend
and business associate involved in the formation of Beacon, a spreadsheet of "first
year revenue projections" for Beacon.  (Mot. at 11; Mot. Ex. T / Dkt. 143-4 at 27.)
Steve stated that the projections were based on "groups that have expressed a level
of interest," but that the spreadsheet did not include "all the groups and

1   independents we will work to align" when Steve could approach them without his

2   "current duty of loyalty."  (Id.)  The email was labeled "confidential" and instructed

3   Mr. Christensen to "please keep confidential."  (Id.)  At his deposition, Mr.

4   Christensen testified that he understood the phrase "groups that have expressed a

5   level of interest" to refer to groups that had "really appreciated Steve Borgquist's

6   help with their purchasing" while Steve was employed by HPSI and "expressed that

7   he … was capable of doing his own company."  (Mot. Ex. U / Dkt. 143-4 at 32.)

8   Steve testified that the projections in the spreadsheet "likely came from" revenues

9   in HPSI reports.  (Mot. Ex. G / Dkt. 143-3 at 3.)

10          In January 2018, Steve sent Brent multiple emails attaching lengthy

11   spreadsheets and reports of HPSI's customer sales and purchase data, customer

12   pricing data, customer rebate data, customer volume analyses, and data concerning

13   Plaintiffs' proprietary business strategies for their customers and vendors.  (Mot. at

14   11; Mot. Exs. B-F / Dkt. 143-2 at 5-201; Hess Decl. ¶ 10.)  Although the text of the

15   emails shows that Steve originally received these documents at his HPSI email

16   account, they are forwarded from Steve's personal email address to Brent's

17   personal email address.  The emails showing that Steve forwarding this information

18   from his work address to his personal address are missing; presumably they were

19   among the emails that Steve deleted in late June or early July 2018 (as discussed

20   further below).  (Mot. at 11-12.)

21          On January 10, 2018, Steve sent Brent and Jacob Christensen an email with

22   the subject line "BANNER presentation."  (Mot. Ex. V / Dkt. 143-4 at 34.)  The

23   email says, "See attached!  This is getting exciting … Can't wait!  As always,

24   highly confidential."  (Id.)  Attached to the email was a PowerPoint presentation

25   entitled "Introducing Banner Purchasing, January 2018" ("Banner PowerPoint").

26   (Dkt. 101-1 ¶ 30; see also Dkt. 101-13 [the Banner PowerPoint, Ex. L to Plaintiffs'

27   January 17, 2020 motion to compel].)  Plaintiffs contend that "the majority of the

28   information in the Banner PowerPoint was misappropriated from a 2016 HPSI

1   PowerPoint presentation that outlined HPSI's confidential business and growth
2   strategy." (Dkt. 101-1 ¶ 31; Dkt. 101-14 [the HPSI PowerPoint, Ex. M to
3   Plaintiffs' January 17, 2020 motion to compel].)  Steve deleted this email from his
4   personal account; Plaintiffs recovered it by subpoenaing Mr. Christensen.  (Steve
5   Depo., Mot. Ex. I / Dkt. 143-3 at 14; Dkt. 101-1 at 9 ¶ 30.)

6           On January 19, 2018, Steve met with Barry Port, the CEO of Ensign, who
7   was then a customer of HPSI but was negotiating to become a partial owner of
8   Beacon.  (Mot. Ex. W / Dkt. 143-4 at 36 [email referencing "meeting this
9   morning"]; Mot. Ex. X / Dkt. 143-4 at 45 [testimony about meeting]).  Later that
10  day, Steve emailed Mr. Port and other Ensign personnel the Proprietary Information
11  and Post-Employment Restrictions Agreement that he and Brent had signed with
12  Aramark.  (Mot. Ex. W / Dkt. 143-4 at 36-42 [email referring to "non-compete"
13  agreement with attachment].)  Ensign was later hired to provide certain "back
14  office" office functions for Beacon, including legal representation.  (Mot. at 15;
15  Mot. Ex. BB / Dkt. 143-5 at 11-12.)  Steve denied that Ensign had provided any
16  legal advice in connection with this lawsuit.  (Id. at 12.)

17          In or around March 2018, Steve and Brent retained their brother Matthew, a
18  lawyer, "[t]o help negotiate an operating agreement" for Beacon with Ensign
19  Services.  (Matthew Depo., Mot. Ex. AA / Dkt. 143-5 at 3-7.)

20          On June 22, 2018, Steve and Brent announced that they were resigning from
21  HPSI, and they left HPSI on July 2, 2018.  (Borgquist Decls. ¶ 1 / Dkt. 164-1 at 65,
22  69; Mot. Ex. FF / Dkt. 143-5 at 36.)

23          In late June or early July 2018, Steve, Brent, and Mr. Christensen had a
24  meeting during which Steve and Brent told Mr. Christensen: "[W]e're not going to
25  discuss our past employment, and we're certainly not gonna [sic] use any
26  information.  Whether widely available or not, we're not gonna [sic] use any
27  information about our past lives.  And we're not gonna [sic] use any, you know,
28  competitive advantage or anything like that." (Steve Depo., Mot. Ex. J / Dkt. 143-3

1   at 14-15 [testifying that the meeting occurred in early July]; Brent Depo., Opp'n

2   Ex. C / Dkt. 164-1 at 30-31 [testifying that the email deletions occurred sometime

3   between when the Borgquists announced their resignations from HPSI on June 22

4   and when they actually left HPSI July 2].)  They agreed that the Borgquists would

5   delete emails concerning HPSI from their personal accounts.  (Steve Depo., Mot.

6   Ex. J / Dkt. 143-3 at 14-15; see also Brent Depo., Mot. Ex. K / Dkt. 143-3 at 19

7   [confirming that there was a "meeting with Jacob where, you know, [Steve] said

8   that, absolutely, we'll make sure that we don't have anything"].)

9       Mr. Christensen testified that, as part of this process, he "got rid of

10  information that [he] thought could have been from HPSI," i.e., information about

11  "administrative fee percentages" that Steve sent him "after the formation of"

12  Beacon.  (Christensen Depo., Mot. Ex. R / Dkt. 143-4 at 18.)

13      Brent testified that he "did a search [of his personal emails] to see if [he] had

14  any, you know, HPSI-related e-mails or any HPSI information that would have

15  been attached to those e-mails on those accounts."  (Brent Depo., Opp'n Ex. C /

16  Dkt. 164-1 at 29.)  Brent did not "recall the exact search terms that [he] used."  (Id.

17  at 31.)

18      Steve testified that although he could not "remember the exact criteria" he

19  used to delete emails, he thought that he "was searching for e-mails between ...

20  Brent and [Steve] or Jacob."  (Steve Depo., Mot. Ex. J / Dkt. 143-3 at 13.)  When

21  asked about "other materials" he had forwarded "from his HPSI e-mail account to

22  either [his] personal e-mail and/or to Brent's personal e-mail" that had not been

23  deleted, Steve responded:

24      A.    ... I wasn't thinking of those e-mails that were sent for

25            businesses [sic] purposes at the time.  I was only thinking about

26            anything that could be misconstrued by someone to seem like

27            we were using information when we weren't.

28      Q     What do you mean by that, ... anything that could be

21

1      misconstrued as - - as you using information you say you

2      weren't?

3  A   *... We didn't need any information to start what became, you*

4      *know, Banner in July*. We didn't need any information at all.  I

5      mean, it's public knowledge that GPOs make between 1 and 3

6      percent and they negotiate services, contracts on behalf of their

7      customers.  And it really depends on whether or not the

8      suppliers want to work with you.  And we hadn't negotiated or

9      even - - even hinted to a supplier that we had plans to try and

10     start you know, a GPO.

11         So we started it from scratch in - - in July when it became

12     Banner, and we - - we didn't need any information and we

13     certainly didn't want to have any information.

14  (Id. at 16; Steve Depo., Opp'n Ex. B / Dkt. 164-1 at 24) (emphasis added).

15     In addition to deleting emails from his personal accounts, Steve also deleted

16  emails from the "sent" folder of his HPSI email account.  As a result of the ESI

17  Examination Order, Plaintiffs recovered emails from Steve's personal Yahoo email

18  account, the text of which shows that they were forwarded from Steve's HPSI email

19  account to Steve's personal account to the personal email account of Brent or

20  Steve's wife.  However, the original email Steve sent from his HPSI account to his

21  personal Yahoo account had been deleted and could not be recovered.  These

22  emails attached information about HPSI's business.  (See Mot. at 8, 11-12; Mot.

23  Ex. A-F / Dkt. 143-2 at 2-201.)

24     The Borgquists state that they deleted emails "concerning HPSI and Aramark

25  ... [o]ut of an abundance of caution ... because [they] did not want to be accused of

26  maintaining or using any information that Plaintiffs might allege belonged to them

27  even if the information was publicly available or available from other sources."

28  (Borgquist Decls. ¶ 2 / Dkt. 164-1 at 65, 69.)

b.      Discussion.

Defendants argue that when they deleted the emails, "there was no threat of litigation nor did Steve or Brent have any reason to believe they would be sued by Plaintiffs." (Opp'n at 8.)  However, they also argue the Borgquists deleted the emails because "[t]hey did not want to have any HPSI-related material in their possession out of concern that it might be misconstrued that they were using the material for Beacon."  (Id.)  This justification for deleting the emails indicates that, as of late June or early July 2018, Steve and Brent anticipated a dispute with HPSI over the formation of their new company.

The facts in Frank Brunckhorst Co., Ltd. Liab. Co. v. Ihm, No. 11-1883, 2013 U.S. Dist. LEXIS 192273, 2013 WL 12094880 (S.D. Cal. Sep. 30, 2013), R&R adopted, 2013 U.S. Dist. LEXIS 192270, 2013 WL 12094827 (S.D. Cal. Dec. 16, 2013) provide a useful comparison.[7]  There, plaintiff Brunckhorst—a national distributor for Boar's Head—sued former independent distributor Ihm for entering into an agreement with D&W to distribute other delicatessen products, which Brunckhorst claimed violated an unwritten non-compete agreement.  2013 U.S. Dist. LEXIS 192273 at *2-4, 2013 WL 12094880 at *1.  The court found, "[T]here is evidence indicating that defendant Ihm's duty to preserve relevant documents was triggered early in his negotiations with D&W, because he knew he would be sued by plaintiff if he terminated his distributorship with plaintiff in favor of a new distributorship with plaintiff's direct competitor, D&W."  2013 U.S. Dist. LEXIS 192273 at *43, 2013 WL 12094880 at *12.  The court relied on the following evidence: (1) deposition testimony from D&W's CEO that Ihm had told him in April 2011 about the potential for litigation with plaintiff; (2) during negotiations

_____

[7] Although the Court has thoroughly reviewed the parties' briefing, most of the cases cited therein are distinguishable because they consider when a party *should have* anticipated litigation, as opposed to when a party *actually* anticipated litigation.

1  with Ihm and D&W, Ihm's attorney told D&W they needed to discuss "if
2  [Brunckhorst] litigates what support financially and otherwise D&Q is prepared to
3  provide"; (3) testimony and emails showing that defendant Ihm tried to avoid
4  creating a "paper trail" about his negotiations with D&W.  2013 U.S. Dist. LEXIS
5  192273 at *43-46, 2013 WL 12094880 at *13.

6      In this case, unlike Brunckhorst, there is no deposition testimony by the
7  Borgquists, Mr. Christensen, Mr. Port, or their counsel directly stating that they
8  anticipated litigation.  Yet the Borgquists' testimony that they feared their
9  communications about Beacon would be "misconstrued" is a tacit admission of
10  such.  Specifically, they feared being "accused" of wrongdoing if HPSI saw the
11  emails they deleted.  (Borgquist Decls. ¶ 2 / Dkt. 164-1 at 65, 69.)  It shows that
12  they anticipated a dispute with HPSI over the formation of Beacon that could lead
13  to HPSI reviewing the Borgquists' emails to investigate whether the Borgquists had
14  breached their contractual obligations.

15      At the October 13, 2020 hearing on the present motion, defense counsel
16  suggested that the Borgquists had to delete these emails from their personal
17  accounts in order to comply with their HPSI contracts, because the contracts
18  forbade them from retaining HPSI materials.  However, several pieces of evidence
19  indicate that the Borgquists were more interested in deleting communications *about*
20  *Beacon* than they were about deleting *all* HPSI materials in their custody or control.

21      First, when Steve was asked during his deposition why some emails
22  forwarded from his HPSI email account were not deleted, he testified that he was
23  not thinking about emails "sent for businesses [sic] purposes," but rather "only ...
24  about anything that could be misconstrued by someone [i.e., HPSI] to seem like we
25  were using [HPSI] information when we weren't."  (Steve Depo., Mot. Ex. J / Dkt.
26  143-3 at 16.)  When asked to clarify this, he insisted that the Borgquists "didn't
27  need any [HPSI] information to start" Beacon, because all of the information they
28  used was "public knowledge."  (Id. at 16; Steve Depo., Opp'n Ex. B / Dkt. 164-1 at

24.)

Second, Steve deleted emails from the "sent" folder of his HPSI email account.  (See Mot. at 8, 11-12; Mot. Ex. A-F / Dkt. 143-2 at 2-201.)  Since Steve presumably would not have access to his HPSI email account after leaving HPSI, it is not clear why he would need to delete such emails in order to comply with a contractual duty not to possess HPSI materials post-employment.

Finally, the reasons Defendants give for the email deletions are illogical and therefore appear pretextual.  If Defendants were truly concerned with demonstrating that they had not used HPSI information to form Beacon and had relied only on information in the public domain, then the best way to protect themselves from false accusations would have been to preserve this evidence.

Thus, a preponderance of the evidence shows that, when the Borgquists deleted the disputed emails in late June or early July 2018, they believed that litigation with HPSI over the formation of Beacon was likely.  They therefore had a duty to preserve relevant ESI at that time.

**2.      The Court Need Not Decide Whether the Borgquists Reasonably Should Have Anticipated Litigation Before They Deleted the Emails in Late June or Early July 2018.**

Plaintiffs argue that Defendants should have anticipated litigation as early as January 2018, when they took steps to form Beacon.  Yet all of the spoliation alleged by Plaintiffs occurred in or after late June 2018.  (See Mot. at 12-13.)  Accordingly, the Court need not decide whether Defendants should have or actually did anticipate litigation earlier.

**C.      <u>Whether Defendants Should Be Sanctioned for ESI Spoliation.</u>**

Plaintiffs allege that Defendants spoliated the following six categories of ESI, each of which the Court will discuss below:

**[1]** emails from the personal email accounts of Steve and Brent Borgquist …; **[2]** text messages from the Borgquists' cell phones;

**[3]** the contents of Brent Borgquist's Dell laptop, which he "recycled" in July 2019 ... ; **[4]** the contents of Brent Borgquist's iPhone 10, which he discarded in September 2019; **[5]** the contents of Steve Borgquist's prior iPhone, which was allegedly rendered inoperable in or about Summer 2019; and **[6]** certain emails in the Sent Items folder of Steve Borgquist's HPSI email box, which … were intentionally deleted … to conceal the fact that [Steve Borgquist] was sending proprietary HPSI information to his personal email account, his wife's personal email account and Brent Borgquist's personal email account.

(Mot. at 8.)

      **3.**     **The Jury Should Be Instructed to Presume that the Emails Deleted in Late June or Early July 2018 Were Unfavorable to Defendants.**

            a.     The Borgquists Failed to Take Reasonable Measures to Preserve the Emails.

As discussed above, the Borgquists made an intentional decision to delete HPSI-related emails in late June or early July 2018, even though the preponderance of the evidence shows that, at that time, they actually anticipated litigation with HPSI over the formation of Beacon.

            b.     Plaintiffs Have Shown That the Emails Cannot Be Replaced.

Plaintiffs made reasonable attempts to obtain the deleted emails from other sources, including by serving 21 non-party subpoenas for documents on "individuals who Plaintiffs believed were involved in the formation activities of Beacon." (Dkt. 101-1 at 8-9 ¶ 28.)  Some emails were recovered, as discussed above, but some were not.  Moreover, the record shows that the Borgquists often sent emails containing HPSI information to each other when they were contemplating the formation of Beacon.  Plaintiffs attempted to have these emails forensically recovered, with only limited success.  (Reply at 5-6.)

1     c.  Plaintiffs Were Prejudiced by the Loss of the Emails.

2    For the Court to issue sanctions under Rule 37(e)(1), Plaintiffs must show

3 that they were prejudiced by the loss of the text messages.  The parties in this case

4 appear to agree that, to find prejudice, it is sufficient to find that the lost documents

5 were relevant.  (See Mot. at 9, 14 [arguing that the spoliation deprived Plaintiffs of

6 "relevant" documents and information]; Opp'n at 4.)

7    Plaintiffs have shown that they were prejudiced by the loss of the emails

8 because they have recovered some emails which discuss the formation of Beacon

9 and forward HPSI-related information.  These matters are at the heart of the parties'

10 dispute.  Moreover, given that the Borgquists intentionally deleted the emails, the

11 burden is on them to show that the loss was *not* prejudicial.  See, e.g., Mfg.

12 Automation, 2018 U.S. Dist. LEXIS 227206 at *32, 2018 WL 5914238 at *11

13 ("When, as here, spoliation is shown, the burden shifts to the guilty party to

14 demonstrate that no prejudice resulted from the spoliation.").  They have failed to

15 carry this burden.

16     d.  Defendants Deleted the Emails With the Intent to Deprive

17        Plaintiffs of Their Use in Litigation.

18    Having found that the requirements for sanctions under Rule 37(e)(1) are

19 satisfied, the Court considers whether sanctions are available under Rule 37(e)(2)

20 based on a finding that Defendants acted "with the intent to deprive [Plaintiffs] of

21 the information's use in the litigation."

22    As discussed above, the Court finds that the Borgquists actually anticipated

23 litigation with HPSI when they deleted the emails in late June or early July 2018.

24 They testified that they deleted the emails because they did not want the emails to

25 be "misconstrued," presumably during a later legal dispute with HPSI.  This

26 evidence also shows that the Borgquists deleted the emails in order to prevent HPSI

27 from using them as evidence in the litigation that the Borgquists were anticipating.

28 See Porter, 2018 U.S. Dist. LEXIS 151349 at *8, 2018 WL 4215602 at *3

(collecting cases finding Rule 37(e)(2)'s intent requirement is satisfied "when the evidence shows or it is reasonable to infer that the ... party purposefully destroyed evidence to avoid its litigation obligations").  Accordingly, the elements of Rule 37(e)(2) are met.

"Finding an intent to deprive another party of the lost information's use in the litigation does not *require* a court to adopt any of the measures listed in subdivision (e)(2)," if "the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss." Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015 Amendment (emphasis added).  Here, however, an adverse inference instruction as to the emails is appropriate.  Evidence that the Borgquists sent Beacon's co-founders information about HPSI sales or customers in the run-up to Beacon's formation is among the most important evidence in this case.  Given that the emails are irretrievably lost, it is not clear what other measures would suffice to cure the prejudice to Plaintiffs.  Accordingly, it is recommended that the jury be instructed to presume that the deleted emails were unfavorable to Defendants.

**4.      The Jury Should Decide Whether the Borgquists Intentionally Spoliated Text Messages.**

a.      The Borgquists Failed to Take Reasonable Measures to Preserve Their Text Messages.

The Borgquists regularly texted each other and various non-parties identified as witnesses.  (Steve Depo., Mot. Ex. L / Dkt. 143-3 at 25-27, 30.)  Their cell phones have a 30-day[8] automatic delete function that they never disabled.  (Brent Depo., Mot. Ex. N / Dkt. 143-4 at 3-4; Borgquist Decls. ¶ 5 / Dkt. 164-1 at 66, 70.)

Once the duty to preserve evidence has been triggered, then parties must

---

[8] Although Plaintiffs' briefing refers to a 90-day automatic delete function (Mot. at 13), the parties agreed at the hearing that it was really for 30 days.

suspend any automatic deletion protocols and implement a "litigation hold" to ensure the preservation of relevant documents.  <u>Apple Inc.</u>, 881 F. Supp. 2d at 1137.  The Preservation Letter specifically instructed Defendants to preserve text messages.  (Mot. Ex. DD / Dkt. 143-5 at 27 n.1.)  Plaintiffs argue that if Defendants had disabled the automatic delete function upon receiving the Preservation Letter, then they could have produced text messages going back approximately to July 8, 2018.

Defendants' briefing argues that the Borgquists "did not think to change the settings on their phones regarding text messages as a result of the lawsuit."  (Opp'n at 21.)  This is slightly different from their declarations, which state that they "did not think it was necessary to turn off the text auto-delete function because" they had not sent "any text messages containing any information belonging to Plaintiffs or related to any of the claims in Plaintiff's lawsuit...."  (Borgquist Decls. ¶ 5 / Dkt. 164-1 at 66, 70.)  The latter implies that the Borgquists were aware of the automatic delete function and considered disabling it, but intentionally chose not to disable it.  Either way, Defendants did not take reasonable steps to preserve the text messages.

The next considerations in deciding whether to impose sanctions under Rule 37(e)(1) are whether the automatically deleted text messages can be replaced through additional discovery and whether the loss of the text messages caused prejudice to Plaintiffs.

                          b.      Plaintiffs Have Shown that the Text Messages Cannot Be Replaced.

Defendants argue, "Plaintiffs have not presented any evidence that any alleged relevant text messages cannot be recovered from Mr. Christensen and/or Mr. Port [i.e., the recipients of the text messages], if they ever existed."  (Opp'n at 17-18.)  Plaintiffs made reasonable attempts to obtain the text messages from other sources, including by subpoenaing Mr. Port and deposing Mr. Christensen, apparently without success.  (<u>See</u> Dkt. 101-1 at 8-9 ¶ 28 [describing 21 non-party

subpoenas for documents served on "individuals who Plaintiffs believed were involved in the formation activities of Beacon"]; Mot. at 12 [referencing subpoena to Mr. Port]; Baird Decl. ¶ 7 / Dkt. 143-1 at 3 [noting Plaintiffs deposed Mr. Christensen on July 20, 2020]; see also Mot. Ex. S / Dkt. 143-4 at 22 [email from Spencer Samuelian, another text message recipient during the same time frame, stating that he had not retained the texts].)  Plaintiffs also point out that another potential source for recovering the text messages—forensic examinations of the physical phones from which the Borgquists sent the text messages—has also been lost as a result of Defendants' spoliation.  (Reply at 7.)

       c.    Plaintiffs Were Prejudiced by the Loss of the Text Messages.

Defendants argue that the loss of the text messages caused no prejudice, because "there is no evidence that Defendants' text messages have ever contained any materially relevant information."  (Opp'n at 4.)  They argue that the Borgquists "texted each other regarding personal matters due to being brothers and/or having longstanding personal relationships with Mr. Christensen and Mr. Port."  (Id. at 17.)

However, Plaintiffs have provided enough evidence to suggest that at least the deleted text messages from July 2018 contained relevant information, and that Plaintiffs were therefore prejudiced by their loss.  Deposition testimony establishes that the Borgquists and others involved in the formation of Beacon regularly texted each other.  (See Mot. Exs. L-N / Dkt. 143-3 at 23-30, Dkt. 143-4 at 1-4.)  Since the Borgquists left HPSI in early July 2018, text messages from July 2018 may have discussed the formation of Banner/Beacon, established the date of meetings, or documented follow-up communications about the Banner PowerPoint, a document that appears to be based on HPSI's proprietary information.

For example, on January 19, 2018, Steve forwarded his and Brent's non-compete agreements with HPSI to Mr. Port, the CEO of Ensign, and other Ensign personnel.  (Mot. Ex. W / Dkt. 143-4 at 36.)  The email notes, "Thanks so much for the meeting this morning."  (Id.)  When asked at his deposition what the meeting

1    was about, Steve testified that he could not remember because he and Mr. Port "met

2    ... quite frequently" and also "did a lot of things personally...."  (Mot. Ex. L / Dkt.

3    143-3 at 24-25.)  Steve agreed that he "regularly exchange[d] text messages" with

4    Mr. Port.  (Id. at 25.)  Text messages between Steve and Mr. Port around the time

5    of the meeting perhaps could have been used to clarify the purpose of the meeting.

6         The statements in the Borgquists' declarations that they "rarely" use text

7    messaging for business-related information and "typically" communicate personal

8    information via text (Borgquist Decl. ¶ 5 / Dkt. 164-1 at 66, 70) do not

9    convincingly establish that the text messages did not contain relevant information.

10   Given that Defendants' spoliation made the substance of the texts unavailable,

11   Plaintiffs have done enough to show that they were prejudiced by the loss of the

12   July 2018 text messages.

13              d.     The Jury Should Decide Whether Defendants Intentionally

14                     Spoliated the Text Messages.

15        Having found that the requirements for sanctions under Rule 37(e)(1) are

16   satisfied, the Court considers whether sanctions are available under Rule 37(e)(2)

17   based on a finding that Defendants acted "with the intent to deprive [Plaintiffs] of

18   the information's use in the litigation."

19        As discussed above, the Advisory Committee Notes to Rule 37 indicate that

20   negligent or even grossly negligent behavior is insufficient to support sanctions

21   under Rule 37(e)(2).  See Fed. R. Civ. P. 37, Advisory Committee Notes to 2015

22   Amendment (rejecting Residential Funding Corp v. DeGeorge Financial Corp., 306

23   F 3d 99 (2d Cir. 2002)).  Plaintiffs argue broadly that "[i]ntent may be inferred if a

24   party is on notice that documents were potentially relevant and fails to take

25   measures to preserve relevant evidence...."  (Mot. at 23.)  However, courts in this

26   district have reached differing results in cases where, as here, evidence was deleted

27   pursuant to a pre-existing automatic delete function.

28        In Glaukos Corp. v. Ivantis, Inc., No. 18-620-TLV-IDEx, 2020 U.S. Dist.

31

1   LEXIS 193048, 2020 WL 5914552 (C.D. Cal. July 30, 2020), the court imposed an

2   adverse inference jury instruction under Rule 37(e)(2) based on a litigant's failure

3   to "suspend its automatic email deletion policy even when litigation was reasonably

4   foreseeable."  2020 U.S. Dist. LEXIS 193048 at *3, 2020 WL 5914552 at *1.  The

5   court rejected the argument that the spoliating litigant had adopted the email

6   deletion policy for "routine business reasons," finding that it could "infer[] an intent

7   to deprive [the opposing party] of the relevant emails" based on the failure to

8   suspend the policy after litigation was foreseeable.  2020 U.S. Dist. LEXIS 193048

9   at *9, 2020 WL 5914552 at *4.

10          In Porter, in contrast, the court found "no evidence" that the defendant had

11   "intentionally spoliated" a recorded phone call that was deleted "pursuant to [the

12   defendant's] 2-year ESI retention policy," even though the call was deleted after the

13   defendant was under a duty to preserve evidence.  2018 U.S. Dist. LEXIS 151349

14   at *12, 2018 WL 4215602 at *4.  The court found:

15          At most, [the defendant's] behavior amounts to gross negligence, not

16          intentional malfeasance.  At the hearing, Plaintiff's counsel argued

17          that the court should infer intent because [the defendant] had notice of

18          [the plaintiff's] request for production of the ... call for some time and

19          did not act on that request until much later, when [the plaintiff]

20          brought the matter to the court's attention.  While [the defendant]

21          certainly should have done more, and should have acted earlier to

22          preserve a piece of evidence as central as a recording of the dispatch

23          call, *there is no evidence that [the defendant] decided to erase the ...*

24          *call when it was under pressure to produce it.*  Therefore, the court

25          finds that an adverse inference jury instruction is not warranted.

26   2018 U.S. Dist. LEXIS 151349 at *12-13, 2018 WL 4215602 at *4 (emphasis

27   added); see also Wolf v. United Airlines, Inc., No. 18-00591, 2019 U.S. Dist.

28   LEXIS 158350 at *10-11, 2019 WL 4450255 at *4 (although the court was

"perplexed that Defendant apparently made no effort to suspend the automatic deletion of emails related to Plaintiff ... at any time pre- or post-litigation," plaintiff was not entitled to "the penultimate sanction of judgment in his favor" because plaintiff had "produced no evidence to suggest that Defendant, when failing to suspend its automatic deletion of emails, acted with intent to deprive Plaintiff of that evidence, or otherwise engaged in bad faith conduct").

Here, as in <u>Glaukos</u> and <u>Porter</u>, it is undisputed that the Borgquists had used the 30-day automatic delete function for text messages for "many years," i.e., prior to when the current record shows they actually anticipated litigation with HPSI in late June or early July 2018.  (Brent Depo., Mot. Ex. N / Dkt. 143-4 at 3-4.) Defendants argue that the Borgquists' failure to suspend the automatic delete function upon receipt of the Preservation Letter in August 2018 was not intentional because: (a) the "Borgquists are not sophisticated or experienced litigants"; (b) the "last thing on their mind when concerning [sic] their obligations in preserving evidence in this case was turning off the text auto-delete function on their cell phones"; (c) they "never intentionally deleted any text messages"; and (d) "[a]t most, the Borgquists were negligent in failing to turn off the text auto-delete function."  (Opp'n at 23.)

However, the record developed thus far shows that the Borgquists are sophisticated businessmen.  In August 2018, when they received the Preservation Letter, they had access to legal advice both through counsel retained in the lawsuit and their brother Matthew.  The Preservation Letter specifically instructed them to preserve text messages.  (Mot. Ex. DD / Dkt. 143-5 at 27 n.1.)  Moreover, the argument that Defendants simply did not think to turn off the automatic delete function is not strongly supported by the Borgquists' sworn statements, as noted above.  Their declarations state:

> The text messages on [the relevant devices] have been set to
> automatically delete after 30 days.  I rarely use text messaging to

1   communicate business-related information.  I typically use text

2   messaging to communicate personal information with my friends and

3   family.  I *did not think it was necessary* to turn off the text auto-delete

4   function on either of my phone because I did not send any text

5   messages containing any information belonging to Plaintiffs or related

6   to any of the claims in Plaintiffs' lawsuit against me.

7   (Borgquists Decls. ¶ 5 / Dkt. 164-1 at 66, 70) (emphasis added).  This evidence

8   tends to show that the Borgquists considered suspending the automatic delete

9   function but did not do so because, in their opinion, their text messages were not

10  relevant evidence.

11      Reasonable minds could disagree on whether this evidence is sufficient to

12  show that the Borgquists' failure to turn off the automatic delete function was done

13  with the intent to deprive Plaintiffs of the text messages.  In this situation, it is

14  appropriate for the jury to decide this issue.  See <u>Epicor Software</u>, 2015 U.S. Dist.

15  LEXIS 187180 at *4, 2015 WL 12734011 at *2; <u>see</u> <u>also</u> Fed. R. Civ. P. 37,

16  Advisory Committee Notes to 2015 Amendment ("If a court were to conclude that

17  the intent finding should be made by a jury, the court's instruction should make

18  clear that the jury may infer from the loss of the information that it was unfavorable

19  to the party that lost it only if the jury first finds that the party acted with the intent

20  to deprive another party of the information's use in the litigation.  If the jury does

21  not make this finding, it may not infer from the loss that the information was

22  unfavorable to the party that lost it.").

23      **5.    The Jury Should Decide Whether Brent Intentionally Spoliated**

24      **His Dell Laptop By Recycling It in July 2019.**

25      Brent used a Dell laptop while working for HPSI and after his resignation.

26  He "never saved or stored any documents or information related to Plaintiffs on

27  [his] personal Dell laptop," although he did use it to access his personal email

28  accounts, and sometimes electronic data related to Plaintiffs was stored in his

personal email accounts.  (Brent Decl. ¶ 3 / Dkt. 164-1 at 69.)  In fact, Steve testified that "HPSI had [him and Brent] using [their] personal devices as work devices" and they "used them interchangeably."  (Steve Depo., Mot. Ex. H, Dkt. 143-3 at 6.)  Around July 2018, Brent checked the Dell laptop to delete any HPSI-related ESI, but he found none.  (Brent Depo., Opp'n Ex. C / Dkt. 164-1 at 33.)

Brent stopped using the laptop "[s]ometime in 2018," when it "stopped working," i.e., it "would run for a little while and then completely shut off without notice."  (Brent Decl. ¶ 3 / Dkt. 164-1 at 70.)  In July 2019, after the laptop "hadn't been working for a long time," he "threw it away, … put it in a recycle bin."  (Brent Depo., Mot. Ex. O / Dkt. 143-4 at 7; Brent Depo., Opp'n Ex. C / Dkt. 164-1 at 35; see also Brent Decl. ¶ 3 / Dkt. 164-1 at 70 [stating that Brent "cleaned out [his] home office in or around July 2019 and recycled the laptop along with other old electronics to make room for a nursery with the arrival of a new baby"].)  July 2019 was after the filing of this lawsuit but before the parties stipulated to a forensic examination of Defendants' electronic devices.  (Dkt. 113 [stipulation dated February 18, 2020].)  According to Brent, he "had no reason to keep the computer or have it fixed for purposes of recovering any documents or information related to Plaintiffs because [the] laptop computer never contained any such documents or information."  (Brent Decl. ¶ 3 / Dkt. 164-1 at 70.)

> a.   Brent Failed to Take Reasonable Measures to Preserve the Laptop.

Brent recycled the laptop not only after litigation was reasonably foreseeable, but after litigation was actually filed.  His decision to recycle the laptop, apparently without consulting with counsel about whether it should be retained, was not reasonable.

> b.   Plaintiffs Have Sufficiently Shown that the ESI on the Laptop Cannot Be Replaced.

Defendants argue, "Plaintiffs' focus on the Borgquists' electronic devices is a

complete red herring" because "[a]ll of the potentially relevant communications occurred via a third party server (i.e. Yahoo and Gmail)" which might be recoverable via subpoena.  (Opp'n at 15.)  As discussed above, Plaintiffs did conduct non-party discovery to attempt to recover lost emails.  Moreover, as discussed at the hearing on the present motion, Plaintiffs' argument that the laptop contained relevant information is not limited to emails.  The evidence shows that the laptop might have contained, for example, PowerPoint and Excel files Defendants used in planning Beacon's launch.  (See, e.g., Mot. Ex. V / Dkt. 143-4 at 34 [January 2018 email from Steve to Brent and Mr. Christensen attaching the Banner PowerPoint].)  Plaintiffs have sufficiently shown that ESI on the recycled laptop cannot be replaced.

c.      Plaintiffs Were Prejudiced by the Loss of the ESI.

Defendants argue that Brent's decision to discard the laptop caused no prejudice, because it did not contain any relevant documents or emails, and any ESI saved on it became inaccessible when the laptop became inoperable in 2018. (Opp'n at 9.)

Addressing the alternative argument first, parties may not discard their electronic devices during litigation simply because they become inoperable.  As this Court recently noted, the "duty to preserve did not end when the computer allegedly crashed," and "[t]he fact that a personal computer stops functioning is by no means a death knell for the data it contains."  CTC Global Corp., 2019 U.S. Dist. LEXIS 209403 at *25, 2019 WL 6357271 at *8 (citing Dorchester Fin. Holdings Corp. v. Banco BRJ S.A., 304 F.R.D. 178, 182-83 (S.D.N.Y. 2014)).

Regarding whether there were potentially relevant HPSI-related files saved on Brent's Dell laptop, there is evidence that: (1) Defendants used other software applications, like PowerPoint, in planning Beacon's launch (see Banner PowerPoint, Dkt. 101-13); (2) the Borgquists failed to delete all HPSI-related emails from the personal devices they submitted for forensic examination, despite

36

1    their intention to do so (see Mot. at 10-12); (3) Brent checked this laptop for HPSI-

2    related files in or around July 2018, demonstrating he thought some might be saved

3    there (Brent Depo., Opp'n Ex. C / Dkt. 164-1 at 33); and (4) Defendants' co-

4    venturer Mr. Christensen testified that the Borgquists deleted other kinds of

5    documents (not just emails) from their personal electronic devices (Christensen

6    Depo., Mot. Ex. R / Dkt. 143-4 at 19 ["I know they got rid of emails, other

7    documents on personal devices.  And I know Steve had gotten rid of a contract that

8    he had."]).

9        Given that Brent's destruction of the laptop makes the information on it

10   unavailable, Plaintiffs have done enough to show that the laptop contained relevant

11   information, and that they were therefore prejudiced by the loss of the ESI.

12           d.    The Jury Should Decide Whether Brent Intentionally Spoliated

13                 the Laptop.

14       Having found that the requirements for sanctions under Rule 37(e)(1) are

15   satisfied, the Court considers whether sanctions are available under Rule 37(e)(2)

16   based on a finding that Defendants acted "with the intent to deprive [Plaintiffs] of

17   the information's use in the litigation."  As with the text messages, there is evidence

18   from which a reasonable jury could conclude that Brent intentionally spoliated the

19   laptop.

20       The timing of the destruction, in particular, is suspicious.  In July 2019, when

21   Brent chose to recycle the laptop, litigation was well underway and Defendants had

22   already responded to Plaintiffs' first set of RFPs.  (Mot. at 16.)  Nevertheless, a jury

23   may find credible Brent's assertion that he believed he "had no reason to keep the

24   computer or have it fixed...."  (Brent Decl. ¶ 3 / Dkt. 164-1 at 70.)  Given the

25   limited factual record before the Court regarding Brent's decision, and the

26   credibility determination necessarily involved, it is more appropriate for the jury to

27   decide this issue with the benefit of Brent's live testimony.

28

**6.**     **The Jury Should Decide Whether Brent Intentionally Spoliated His iPhone By Trading It in to the Verizon Store in September 2019.**

Brent used a personal iPhone during and after his employment with Plaintiffs to access his HPSI email and personal email.  According to Brent, he did not save or store any HPSI-related data on the iPhone.  Around September 2019, he traded in the iPhone for a new iPhone.  Before trading it in, he did not give the iPhone to counsel so that it could be imaged or its contents copied.  (Brent Decl. ¶ 5 / Dkt. 164-1 at 70; Brent Depo., Mot. Ex. P. / Dkt. 143-4 at 11.)

          a.     Brent Failed to Take Reasonable Measures to Preserve the iPhone.

As with the Dell laptop discussed <u>supra</u>, Brent traded in the iPhone not only after litigation was foreseeable, but after litigation had commenced.  His decision to trade in the iPhone, apparently without consulting with counsel about whether it should be retained or imaged, was not reasonable.

          b.     Plaintiffs Have Sufficiently Shown that the ESI on the iPhone Cannot Be Replaced, and That They Were Prejudiced by the Loss of That ESI.

As with the laptop, Defendants argue that the only relevant communications on the iPhone were "server-based" emails, which Defendants imply can be recovered from other sources.  (Opp'n at 4, 9.)  As discussed above, however, Plaintiffs have made reasonable efforts to obtain the emails from other sources and apparently have been unable to do so.

Additionally, Plaintiffs have shown that the iPhone may have contained relevant evidence apart from the emails.  Both Brent and Steve testified during their depositions that they sometimes saved text messages or emails by taking a "screenshot" on their mobile phones.  (Brent and Steve Depos., Reply Ex. 1 / Dkt. 170-2 at 4, 7-8.)  The phones may have contained text messages from August or

38

September 2019, which would not have been deleted by the phone's automatic delete function.  Getting rid of the device also robbed Plaintiffs of an opportunity to attempt to recover the automatically deleted text messages using forensic examination.

> c.     The Jury Should Decide Whether Brent Intentionally Spoliated the iPhone.

As with the laptop, reasonable jurors could disagree as to whether Brent intentionally spoliated the iPhone.  The timing of the spoliation is suspicious, but a jury might find Brent's explanation—that he was clearing out old devices and did not believe the iPhone had anything HPSI-related on it—to be credible.

> **7.     Steve's iPhone, Which Was Not Examined in the Manner Provided by the ESI Examination Order.**

Steve used a personal iPhone during and after his employment with Plaintiffs to access his HPSI email and personal email.  According to Steve, he did not save or store any HPSI-related data on the iPhone.  (Steve Decl. ¶ 5 / Dkt. 164-1 at 66.)

At his deposition on July 13, 2020, Steve testified that the iPhone was not working, but that he still had the phone in his possession and knew its location, as follows:

> A. I -- I don't know the phone – the phone – the phone actually
> completely crashed late at night when I was working on it.  And so I
> was forced to get a new phone.  Couldn't get it to restart.  But it's –
> it's at my house somewhere.
> Q. It is?
> A. I think so, yeah.  It's dead as can be.  It cannot be restarted,
> because I tried for about a day and a half to get it to work.  But it's
> somewhere in my house.

(Reply Ex. 1 / Dkt. 170-2 at 11.)

About two weeks after the deposition, on July 28, 2020, Plaintiffs requested

1   production of Steve's iPhone so that it could be forensically examined per the ESI

2   Examination Order.  (Reply Ex. 2 / Dkt. 170-2 at 22 [emails between counsel].)  Per

3   that order, Defendants' electronic devices were to be examined by a "mutually

4   agreed-upon third party."  (Dkt. 117 at 3.)  The parties had agreed to use a company

5   called Driven.  (See Reply Ex. 2 / Dkt. 170-2 at 14-24.)

6       Defense counsel at first responded that the iPhone "died and could not be

7   restored when Steve took it to the Apple store," and that Steve did "not have the

8   phone in his possession."  (Id. at 22.)  On August 6, however, defense counsel

9   stated that Steve found the iPhone, which he had mistakenly thought had been

10   donated to charity.  Defense counsel agreed to give the phone to Driven for

11   examination.  (Id. at 21 [email memorializing phone call between counsel].)

12       Instead, on August 25, the iPhone was given to Setec.  (See Setec Decl. ¶ 4 /

13   Dkt. 164-1 at 74.)  Setec determined that the iPhone "appears to have been

14   submerged in water for an extended period of time which caused extensive damage

15   and continued corrosion to [its] logic board."  (Setec Decl. ¶ 4 / Dkt. 164-1 at 74.)

16       When Plaintiffs' counsel asked for an update on Steve's iPhone on

17   September 8, defense counsel responded that they were "still in the process of

18   trying to have the phone restored."  (Reply Ex. 2 / Dkt. 170-2 at 14-15.)  Plaintiffs'

19   counsel did not learn of the Setec examination until Defendants filed their

20   opposition to the present discovery motion on September 22.  (Id. at 14.)

21       At the October 13, 2020 hearing on the present motion, when asked why the

22   iPhone was given to Setec, defense counsel stated that Driven told defense counsel

23   that another company needed to attempt to restore the device, and that Driven

24   would analyze any data that was restored.  According to defense counsel, Driven

25   recommended Setec.  This is not memorialized in any contemporary written

26   correspondence or sworn declarations submitted to the Court.

27       In opposing the present motion, Steve declared that in the summer of 2019,

28   the iPhone "crashed and ceased working due to water damage."  (Steve Decl. ¶ 5 /

Dkt. 164-1 at 66.)  He attempted to have the iPhone "fixed by Setec Investigations, but it could not be restored."  (Id.)

Steve's declaration and deposition testimony do not offer any explanation about how his iPhone might have been submerged in water for an extended period of time, and neither affirmatively states that he does not know how this occurred. At the October 13, 2020 hearing on the present motion, defense counsel stated that Setec found the corrosion more consistent with seawater than freshwater, and counsel speculated that Steve, an avid surfer, could have damaged the iPhone while surfing.  However, there is no support for this conjecture in the sworn declarations or deposition testimony.

### a.      ESI Spoliation Sanctions Are Not Appropriate.

Although Steve's iPhone became inoperable in the summer of 2019, after this lawsuit was filed, the facts surrounding the cause of that inoperability are too unclear to support a finding that Steve failed to take reasonable measures to preserve the ESI on the iPhone.  Spoliation sanctions under Rule 37(e) therefore are not appropriate.

### b.      Defendants' Failure to Comply with the ESI Examination Order Warrants an Award of Reasonable Expenses.

The Court finds, however, that Defendants failed to comply with the ESI Examination Order, which required Defendants to "submit to a forensic examination of their" ESI, including ESI on "Defendants' personal ... cell phones," at Defendants' expense, by "a mutually agreed-upon third party."  (Dkt. 117 at ¶ 2.) Defendants were not free to do whatever they wished with Steve's iPhone without consulting Plaintiffs' counsel, even if they believed they had good reasons for doing so.  If Driven indeed told defense counsel that attempting to recover data from Steve's iPhone in its present state was outside its purview, the ESI Examination Order required defense counsel to convey this information to Plaintiffs' counsel and reach an agreement with Plaintiff's counsel as to what

41

should be done with Steve's iPhone.

Where a party fails to obey a discovery order, the Court "must order the disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).  Defendants have not shown that their failure to comply with the ESI Examination Order was substantially justified or that an award of expenses would be unjust.

As discussed below in section III.E., Plaintiffs are entitled to recover the reasonable attorney's fees they incurred in bringing the present motion.  However, this alone does not cure the prejudice suffered by Plaintiffs as a result of Defendants' failure to comply with the ESI Examination Order, because now that discovery cut-off has passed, Plaintiffs would ordinarily be unable to have Steve's iPhone examined in a manner consistent with that Order.  It is therefore recommended that the District Judge enter an order: (a) allowing, if Plaintiffs so choose, Plaintiffs to have the iPhone examined by Driven or another mutually agreed-upon vendor to determine the cause of its inoperability and if any ESI can be recovered, and (b) requiring Defendants and the law firm of current defense counsel to pay any expenses incurred as a result of this new examination.

**D.**      **Untimely Production of Physical Documents Given to Plaintiffs' Prior Counsel.**

    **1.**      **Factual Background.**

        a.      Defendants' Responses to RFP 2.

In February 2019, Plaintiffs propounded their first set of RFPs, which included RFP 2 requesting "*All Aramark and/or HPSI documents in Defendants' possession, custody or control*, or which Banner relied on in any way in connection with its formation or business operations, including but not limited to the information enclosed with Steve Borgquist's email dated October 25, 2017 attached

hereto as Exhibit A."  (Mot. Ex. GG / Dkt. 143-5 at 45) (emphasis added).  Defendants initially responded with objections only in March 2019.  (Mot. Ex. HH / Dkt. 143-5 at 48.)

On April 23, 2019, Plaintiffs sent a letter identifying deficiencies in Defendants' discovery responses, including that "Defendants provided no substantive responses and produced no documents in response to Request for Production No. 2, which seeks documents Defendants relied upon in any way in the formation of Beacon."  (Dkt. 178-1 at 6.)

In supplemental responses dated June 6, 2019, Defendants again objected, in part on the grounds that "it lack[ed] foundation and assume[d] Plaintiff relied on any 'Aramark and/or HPSI documents' in the formation of Banner."  (Mot. Ex. II / Dkt. 143-5 at 55.)  Subject to these objections, they responded, "No such documents exist, and Defendants do not have a copy of the information enclosed with Steve Borgquist's email dated October 25, 2017, and did not rely on the information enclosed with Steve Borgquist's email dated October 25, 2017 in the formation of" Beacon.  (Id.)

After meeting and conferring again in August 2019, Defendants provided a second supplemental response stating, "Defendant did not rely on any Aramark and/or HPSI documents, including the information enclosed with Steve Borgquist's email dated October 25, 2017 attached as Exhibit A to Plaintiff's Request for Production of Documents, Set One, in connection with Beacon's formation or business operations.  Accordingly, no such documents ever existed."  (Dkt. 101-10 at 113; see also Dkt. 101-12 at 2-3 [August 2019 email from defense counsel stating, "Defendants do not know what happened to the spreadsheet.  However, they did not rely on it.  Defendants did not initiate any communication with HPSI customers or solicit any of HPSI['s] customers (including but not limited to, the businesses who may have been listed on the spreadsheet) regarding the possible formation of a GPO...."].)

In January 2020, Plaintiffs moved to compel further responses to certain discovery requests, including RFP 2.  (Dkt. 101.)  In the February 2020 ESI Examination Order, pursuant to the parties' agreement, the Court directed Defendants to "timely supplement their responses" to RFP 2 and the other requests, "including producing any responsive documents to each of the requests that are in Defendants' possession, custody, or control[.]"  (Dkt. 117 at 2 ¶ 1.)

> **b.**     Steve's Testimony about the Box of HPSI Documents in His Garage.

At a deposition on July 13, 2020, Steve testified that during the lawsuit, he discovered he had "some information in a box, from a remodel of [his] home office ... in [his] garage with a bunch of other stuff being stored."  (Steve Depo., Mot. Ex. FF / Dkt. 143-5 at 40-41.)  The box contained "about 10 inches thick of documents" that were "marketing material, some printed materials" and "HPSI vendor guides."  (Id.)  He gave the box to his attorney, then John Lattin.  (Id.)  He made the discovery in August 2018, i.e., "around" the time he received Plaintiffs' Preservation Letter and retained Mr. Lattin.  (Id. at 42.)

Defendants produced the box of documents on July 31, 2020 (Baird Decl. ¶ 28 / Dkt. 143-1 at 6), several days after the close of discovery (Dkt. 122) and about a year after Defendants served their second supplemental response to RFP 2.

> **c.**     Mr. Lattin's Declaration.

Mr. Lattin declares that he interpreted Plaintiffs' counsel's April 2019 Letter as a "clarification" that RFP 2 was only seeking "documents Defendant relied on in the formation of Beacon."  (Lattin Decl. ¶¶ 7-8 / Dkt. 178 at 3.)  Because Defendants had told him that they did not rely on any of the documents in the box in forming Beacon, Mr. Lattin concluded that the box of documents was not responsive to RFP 2.  (Id.)

**2.     Discussion.**

RFP 2 is written in the disjunctive.  It asks for "All Aramark and/or HPSI

documents" that are "in Defendants' possession, custody or control, *or* which
Banner relied on in any way in connection with its formation or business operations
…."  (Mot. Ex. GG / Dkt. 143-5 at 45) (emphasis added).  Although perhaps
inartfully worded—since a party generally can only produce things that are in its
possession, custody, or control—the literal language of the RFP clearly
encompassed the box of documents because it was a box of HPSI documents in
Defendants' possession.

Moreover, while counsel often narrow discovery demands during the meet
and confer process, counsel also often refer to discovery demands in meet and
confer letters by their topic or main idea without writing out the demand in full.
Nothing in the April 2019 letter from Plaintiffs' counsel indicates that Plaintiffs
intended to narrow the scope of RFP 2.  Indeed, Defendants did not object to RFP 2
based on overbreadth.  (Mot. Ex. HH / Dkt. 143-5 at 48 [objecting that Plaintiffs
had not adequately identified their trade secrets prior to serving discovery and that
RFP 2 "lack[ed] foundations and assume[d] Plaintiff [sic] relied on any 'Aramark
and/or HPSI documents' in the formation of Banner"].)  Rather, Plaintiffs' counsel
was just referring in a shorthand way to the topic of RFP 2.

To the extent Mr. Lattin interpreted this reference as a substantive
"clarification" that narrowed the scope of RFP 2 (and narrowed it to the point
where it included nothing, because Defendants denied relying on any HPSI
documents to form Beacon), his interpretation was not reasonable.  When he signed
the first supplemental response to RFP 2 indicating that no responsive documents
existed, and never mentioned that he was responding to something other than RFP 2
as written, Plaintiffs reasonably understood the response as a representation that
Defendants did not have any HPSI documents in their possession, custody, or
control.   In fact, the record now shows that nearly a year earlier, Steve had given
Mr. Lattin a box of HPSI documents.

As discussed below in section III.E., Plaintiffs are entitled to recover the

45

1   reasonable attorney's fees they incurred in bringing the present motion.  However,

2   this alone does not cure the prejudice suffered by Plaintiffs as a result of

3   Defendants' evasive and incomplete responses to RFP 2, because now that the

4   discovery cut-off has passed, Plaintiffs would ordinarily be unable to conduct

5   follow-up discovery regarding the documents.  It is therefore recommended that the

6   District Judge enter an order: (a) allowing, if Plaintiffs so choose, Plaintiffs to

7   depose Steve Borgquist for an additional 3 hours about the documents in the box,

8   and (b) requiring Mr. Lattin's law firm to pay any reasonable expenses incurred in

9   conducting this deposition, including attorney's fees.

10       Mr. Lattin's law firm, rather than Defendants, should pay the costs of this

11   deposition because Steve's testimony was that he gave the box of documents to Mr.

12   Lattin and he was unaware whether they had been produced during discovery.  The

13   failure to timely produce the documents was therefore caused by Mr. Lattin rather

14   than Defendants.

15   **E.     To Cure the Prejudice Due to ESI Spoliation, Plaintiffs Should Be**

16          **Awarded Attorney's Fees Incurred in Bringing the Instant Motion.**

17       Federal Rule of Civil Procedure 37(e)(1) authorizes courts to employ

18   measures "no greater than necessary to cure the prejudice" caused by spoliated ESI.

19   "The only express limitation to curative measures under Rule 37(e)(1) is that they

20   'do not have the effect of measures that are permitted under subdivision (e)(2).' ...

21   There is no requirement in Rule 37(e) or the Committee Notes that a court must

22   make a finding of bad faith before imposing monetary sanctions, and district courts

23   have imposed monetary sanctions pursuant to Rule 37(e)(1)." Spencer v. Lunada

24   Bay Boys, No. 16-02129-SJO-RAOx, 2018 WL 839862 at *1 (C.D. Cal. Feb. 12,

25   2018) (rejecting argument that Rule 37(e)(1) does not authorize monetary

26   sanctions), aff'd, 806 F. App'x 564, 568 (9th Cir. 2020) (finding the district court

27   "did not abuse its discretion by ordering the sanctions award," although the amount

28   was in error); see also Colonies Partners, L.P. v. Cty. of San Bernardino, No. 18-

1   00420-JGB-SHK, 2020 WL 1496444 at *12-13 (C.D. Cal. Feb. 27, 2020), R&R

2   adopted, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020); Matthew Enter., Inc. v.

3   Chrysler Grp. LLC, No. 13-04236-BLF, 2016 WL 2957133 at *5 (N.D. Cal. May

4   23, 2016) (awarding party prevailing on Rule 37(e) motion "reasonable attorney's

5   fees it incurred in bringing this motion").

6         An award of attorney's fees incurred by Plaintiffs in bringing the instant

7   motion is necessary to cure the prejudice they have suffered due to the ESI

8   spoliation.  Defendants, current defense counsel's law firm, and the law firm of

9   former defense counsel Mr. Lattin should be held jointly and severally liable for the

10   reasonable expenses Plaintiffs incurred in bringing the instant motion, including

11   attorney's fees.  The District Court should order the parties to meet-and-confer over

12   the amount of such fees, and if they cannot reach agreement, Plaintiffs should be

13   allowed to submit evidence of such expenses.

14   **IV.**

15   **RECOMMENDATION**

16         Based on the foregoing, IT IS THEREFORE RECOMMENDED that the

17   District Court issue an Order:

18       (1)    approving and accepting this R&R;

19       (2)    directing that at trial, the jury will be instructed to presume that the

20               emails Steve and Brent Borgquist deleted in late June or early July

21               2018 were unfavorable to Defendants;

22       (3)    directing that at trial, the jury will be instructed that: (a) the jury

23               should decide if the Borgquists deleted text messages, recycled

24               Brent's Dell laptop, and traded in Brent's iPhone with the intent to

25               deprive Plaintiffs of their use in litigation, and (b) if so, the jury

26               should presume any ESI on those devices was unfavorable to

27

28

1    Defendants;[9]

2    (4)    finding that Defendants, the law firm of current defense counsel, and

3    the law firm of former defense counsel Mr. Lattin jointly and

4    severally liable for the reasonable expenses Plaintiffs incurred in

5    bringing the instant motion;

6    (5)    if Plaintiffs wish to have Steve's iPhone reexamined by Driven or

7    another mutually agreed-upon vendor, Defendants and the law firm of

8    current defense counsel shall pay the reasonable expenses of

9    conducting such an examination;

10    (6)    if Plaintiffs wish to further depose Steve about the box of documents

11    in his garage, the law firm of former defense counsel Mr. Lattin

12    should pay any reasonable expenses incurred in conducting such a

13    deposition, including attorney's fees;

14    (7)    directing Plaintiffs to file a status report within fourteen (14) days of

15    the order accepting this R&R advising the Court whether:

16    (a) Plaintiffs wish to have Steve's iPhone reexamined by Driven or

17    another agreed-upon company; (b) Plaintiffs wish to depose Steve for

18    a further 3 hours regarding the box of documents in his garage; and

19    (c) after meeting and conferring with current and former defense

20    counsel, whether the parties agree on the reasonable amount of

21    expenses Plaintiffs incurred in bringing the instant motion and will

22    incur in conducting the additional discovery allowed by this R&R.

23    DATED:  January 27, 2021

24                                        KAREN E. SCOTT

25                                        UNITED STATES MAGISTRATE JUDGE

26    [9] As noted above, the Court anticipates that the parties will submit specific
proposed language for the jury instructions discussed in this R&R pursuant to the

27    District Judge's standard pre-trial procedures.

28

48